Deborah A. NORTHCROSS et al.,
Plaintiffs-Appellants,

v.

The BOARD OF EDUCATION OF the
CITY OF MEMPHIS et al.,
Defendants-Appellees.

No. 15558.

United States Court of Appeals
Sixth Circuit.

June 12, 1964.

Derrick Bell, New York City, (A. W. Willis, Jr., R. B. Sugarmon, Jr., Memphis, Tenn., Jack Greenberg, Constance Baker Motley, Derrick A. Bell, Jr., New York City, on the brief; H. T. Lockard, B. L. Hooks, B. F. Jones, Memphis, Tenn., of counsel), for appellants.

Jack Petree, Memphis, Tenn., Evans, Petree & Cobb, Memphis, Tenn., of counsel, for appellees.

Before WEICK, Chief Judge, and CECIL and O'SULLIVAN, Circuit Judges.

CECIL, Circuit Judge.

This cause was previously before this Court on appeal from the United States District Court for the Western District of Tennessee. The subject of that appeal was the desegregation of the public schools of Memphis. We reversed the judgment of the District Court and remanded the case with instructions to enjoin the appellee Board of Education from operating a bi-racial school system or in the alternative to require the Board to adopt a plan looking toward the reorganization of the schools on a nonracial basis. Northcross v. Board of Education of the City of Memphis, 6 Cir., 302 F.2d 818, cert. den., 370 U.S. 944, 82 S.Ct. 1586, 8 L.Ed.2d 810. Upon remand the district judge conducted a hearing and approved a proposed plan of operation submitted by the Board. This appeal is from the judgment of approval of the plan [1] by the District Court.

One of the assignments of error concerns the approval by the District Court of the new school-zone lines fixed by the Board. It was provided in the plan that the Board would immediately establish school zones or districts based upon the location of school buildings with a single geographical boundary for each school according to the latest scholastic census for grades 1, 2 and 3. This is an essential step and probably the most important one in organizing schools on a non-racial basis. We said in our former opinion, 302 F.2d at p. 823: "Minimal requirements for non-racial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right." The Board did abolish dual zone lines but the appellants claim that the new zones were formed by irregular lines or by gerrymandering so as to preserve segregated schools.

In rezoning on a unitary basis, the Board, according to the testimony of Mr. Galbreath, president, gave consideration to: 1. utilization of the buildings, 2. proximity of pupils to the schools to be attended, 3. zones drawn with a view to disturbing the people of the community as little as possible, 4. natural boundaries, and 5. the interests of the community, pupils and school board. Dr. Floyd L. Bass, Dean of LeMoyne College in Memphis, testified on behalf of the appellants. Dr. Bass had made a suggested zoning map from information furnished to him by the Board. The factors which he took into consideration were: 1. optimum use of planned or existing facilities, 2. convenient attendance of chil-

---

1. The plan as amended and approved appears in the appendix hereto.

dren of school age, 3. the essential limitation of natural and structural hazards to the safety of children, and 4. the deliberate elimination of irregularity in boundary lines which suggests gerrymandering for any purpose. In constructing his zones, Dr. Bass had before him the new zone lines of the Board which he reviewed with reference to the criteria used by him in making his map. Dr. Bass prepared three maps, one for the grades from 1 to 6, one for grades 7, 8 and 9, and one for senior high schools. We will consider here only the one for grades 1 to 6.

Dr. Bass testified that in about forty schools his zone lines were practically identical with those of the Board and that any attempt to zone these schools would leave them almost totally white. There were about 39 schools so situated that there was a possibility of zoning them so as to get either a maximum or minimum amount of desegregation. Dr. Bass suggested that the Board's lines for these schools had the appearance of gerrymandering so as to preserve a maximum amount of segregation.

Dr. Bass, in his testimony, analyzed the Board's zoning of the Vollentine and the Klondike schools to illustrate his point. Vollentine was predominantly white and Klondike was predominantly Negro. There is a peak in the Vollentine zone which extends into the Klondike area. The residents zoned off in this peak are predominantly white. The pupil ratio per room in the Vollentine school is nineteen, while the ratio in Klondike is twenty-four. Dr. Bass cited this as a failure to fully utilize the Vollentine building. If this line had been drawn straight, it would have put twenty white students in the Klondike zone. Dr. Bass gave similar testimony with reference to the Springdale and the Hollywood schools, both white, and Hyde Park, a Negro school. He would transfer, according to his zoning, ninety-seven students from Vollentine to Hyde Park, twenty students from Vollentine to Klondike, and one hundred and thirty from Hyde Park to Hollywood. Dr. Bass mentioned specifically several other schools and said that to a greater or lesser degree the situation described concerning Vollentine, Klondike and Hyde Park was true of all of the forty zones where there was a possibility of having more or less desegregation.

Dr. Bass repeatedly qualified his opinion and judgment. He said, concerning zoning, it is a "judgmental thing" and that two individuals constructing boundary lines will come up with many similarities and a few differences, because of the factors involved. He also said: "Now, as I say, you can't construct lines which are perfect squares and perfect rectangles, and may run around just as they are in here." Finally he said: "Facilities which are available to the local school systems were, of course, also not available to me." * * * "Yes, the equipment which they have at their disposal to carry out the functions of administration, the administrative assistants who also provide additional intelligence with respect to this kind of thing. Not being part of the school system, there are many things of this sort which I could not take into account."

There is persuasive evidence here tending to show that zoning was accomplished for the purpose of preserving segregation to some extent. Dr. Bass was very fair and candid in his testimony. He testified to his overall conclusion without giving specifically the factors which led him to his determination with reference to each school. On the whole, there is not sufficient evidence before us to determine on a school-by-school basis that zoning lines were arbitrarily drawn without consideration for pertinent factors and for the purpose of defeating desegregation. However, in the one example we have cited, Vollentine and Klondike, it appears obvious that the zones are gerrymandered to preserve a maximum amount of segregation. We cannot draw school-zone lines. That is a discretionary function of the school board./ We cannot say from the evidence before us that the Board abused its discretion but the evidence of Dr. Bass is

sufficiently challenging to require the Board to submit evidence of its application of acceptable criteria for the formation of the boundaries of the forty schools here involved. Where challenged the burden of proof is on the Board to demonstrate that the zone lines of each school were not drawn with a view to preserve a maximum amount of segregation. /Where the Board is under compulsion to desegregate the schools/ (1st Brown case, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) we do not think that drawing zone lines in such a manner as to disturb the people as little as possible is a proper factor in rezoning the schools. Nor do we think that preserving school loyalties, as defined by the Board, is a proper criterion. We cannot approve the zoning as adopted by the Board nor are we prepared to say that it has been arbitrarily done in order to retain the maximum amount of segregation.

/This phase of the case will be remanded to the District Court with instructions to take further testimony on the question of zoning. /

Another assignment of error is that the trial judge erred in approving the Board's plan of a grade a year desegregation. It is claimed that this does not now comply with the Supreme Court's current interpretation of desegregation with all deliberate speed, as required by the second Brown case (349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083).

The Board's plan was submitted to the District Court on August 31, 1962. It provided for desegregation of grades 1, 2 and 3 for the school year beginning in September, 1962. Grade 4 was to be desegregated in 1963 and thereafter one grade a year would be desegregated until all grades in all schools were desegregated. The Board of its own volition has accelerated this schedule and is now, according to the testimony of Mr. Galbreath, president of the Board, unequivocally committed to the desegregation of the 6th grade in September, 1964. The Board is to be commended for this action and we have no reason to believe

that it would not further accelerate the schedule.

However, if it does not further voluntarily accelerate the schedule, it will be September of 1970 before desegregation extends through all of the grades of senior high school. It has been ten years since the first Brown decision and nine years since the second one in which the Court said that desegregation should be accomplished with all deliberate speed. The Court had in mind that there would be administrative problems involving facilities etc., but assumed that school boards would make immediate plans for complying with the Court's order.

It has been a year since the District Court decided this case and, almost simultaneously with the decision, the Supreme Court handed down its opinion in Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529. There are guideposts there which point the way to future action. The Court said: "The basic guarantees of our Constitution are warrants for the here and now and, unless there is an overwhelmingly compelling reason, they are to be promptly fulfilled." P. 533, 83 S.Ct. p. 1318. The Court further said, at p. 530, 83 S.Ct. at p. 1317: "Given the extended time which has elapsed, it is far from clear that the mandate of the second Brown decision requiring that desegregation proceed with 'all deliberate speed' would today be fully satisfied by types of plans or programs for desegregation of public educational facilities which eight years ago might have been deemed sufficient." See Monroe v. Board of Commissioners of the City of Jackson, Tennessee, 221 F.Supp. 968, 971, W.D. Tenn.; and Calhoun v. Latimer, 84 S. Ct. 1235. See also Griffin v. County School Board of Prince Edward County, 84 S.Ct. 1226, where the Court stated: "The time for mere 'deliberate speed' has run out * * *."

In the light of the Watson case and considering the time that has elapsed since the Supreme Court declared biracial schools unconstitutional, we are of the opinion that desegregation of the

Memphis schools should be completed before 1970. In the second Brown case, the Court said the burden was on the defendants to establish that time was necessary. "To that end," the Court said, 349 U.S. at p. 300, 75 S.Ct. at p. 756: "the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems." No evidence was offered to show that any of these administrative problems were obstacles to a more speedy transition to non-racial schools. The argument that a more gradual change will avoid interracial disturbances, confusion and turmoil was answered in Watson, 373 U.S. p. 535, 83 S.Ct. p. 1319. "* * * (C)onstitutional rights may not be denied simply because of hostility to their assertion or exercise."

By the end of the school year 1964–1965, the Board will have had experience with the desegregation of the elementary schools. From this experience it ought to be an easy step to take the entire junior high schools in September of 1965 and the entire senior high schools at the beginning of the school year of 1966. The 6th grade which will become the 7th grade in 1965 will already have had experience in desegregated classes. The same thing will be true of the 10th grade in 1966. The Board will have more than a year to prepare for the desegregation of junior high schools and over two years to prepare for the change in senior high schools. The junior and senior high school students are more mature and should be prepared to accept this change.

█ We do not question the good faith of the Board. From the disposition to voluntarily accelerate the schedule, we think the Board might and probably would adopt the schedule we here propose. In order that there may be some reasonably short termination to this controversy, so that the administrative staff of the schools may devote their time to the improvement of the schools on a nonracial basis and in order that the pupils and their parents may settle down to normal school life, we modify the judgment of the District Court. The Board will, therefore, accelerate its plan of desegregation so as to desegregate the junior high schools in September of 1965 and the senior high schools for the term beginning in the fall of 1966.

A further assignment of error relates to paragraph V [2] of the plan submitted by the Board which provides for transfers from schools where bi-racial assignments may occur to open schools. At about the time this case was decided the Supreme Court decided Goss v. Board of Education of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632. There the Court declared invalid a minority transfer plan which had been followed in this Court since Kelley v. Board of Education of the City of Nashville, 270 F.2d 209, cert. den., 361 U.S. 924, 80 S. Ct. 293, 4 L.Ed.2d 240. This paragraph was then substituted for the original paragraph V of the plan as submitted to the District Court.

It is claimed on behalf of the Board that paragraph V was drawn with an attempt to follow verbatim the language of the Goss case. We are of the opinion that it does not come within the permissive use of transfer as decided by that case.

█ It applies to schools "where bi-racial assignments may occur as a result of the establishment of unitary non-racial school zones." In such cases pupils may be transferred to open schools. Open schools are defined as schools that do not have a full enrollment. They may be predominantly Negro, predominantly white, wholly Negro or wholly white. It permits of the transfer of minority pupils either Negro or white out of a school

2. Paragraph V of appendix.

that becomes bi-racial as a result of unitary zoning. The transfer may be to a school where the race of the transferee is either exclusive or predominant. From the testimony this is the purpose of the transfer provision and in practice this is the way it is used. In support of such transfers testimony was offered on behalf of the Board to show that there would be a bad psychological effect on a child of a minority race in a desegregated school. We are of the opinion that no such generalization can be made. Transfers by pupils from schools where bi-racial assignments will not occur (about one-half of the schools) to desegregated schools are not encompassed within the transfer provision. Transfers under paragraph V are based on race. As written and practiced, it is discriminatory and tends to perpetuate segregated schools. The Court said in the Goss case, 373 U.S. at p. 689, 83 S.Ct. at p. 1409: "Likewise, we would have a different case here if the transfer provisions were unrestricted, allowing transfers to or from any school regardless of the race of the majority therein. But no official transfer plan or provision of which racial segregation is the inevitable consequence may stand under the Fourteenth Amendment."

We conclude that paragraph V of the plan of the Board, known as the transfer provision, is invalid as a matter of law.

The final assignment of error as stated by appellants is "Whether the court below erred in refusing to require appellees to initiate plans for faculty desegregation and preventing the discovery of teacher data and records *which would have enabled appellants to prepare such plans*." (Emphasis added.) This question arose by the denial of the district judge of a motion of the appellants for discovery. The appellants sought to require the Board to furnish them certain statistical data concerning all of the teachers of the school system contained in documents and records of the Board.

In overruling the motion, the trial judge did not deny the appellants the right to have a determination of the question of faculty desegregation. He denied the motion as of the time it was submitted (April 10, 1963) for two reasons.

One reason was that the request was made at an inappropriate time. The judge said: "Additionally, the Board's entire personnel division, it appears, is now putting in extra long hours processing some two thousand teacher applications, looking to the employment of five or six hundred new teachers for the school year commencing in September, 1963. Now, this in itself is an arduous task which will take a lot of time, and to interrupt this work now to search its files for the voluminous records which are requested concerning the presently employed thirty-eight hundred teachers would not only be very burdensome but would work a hardship on the Board and disrupt and seriously impair, you might say, the operation of the school system." He suggested therefore that it was reasonable that the production of the material in question be delayed until after September 1st. The judge indicated that according to proof about half a million records and documents were involved. He doubted that they could be produced by the time of the trial, then set for May.

Another reason for the judge's decision was that the teachers might not have standing in this proceeding to raise the question. He referred to a case from Chattanooga, then pending in our Court, in which the teacher question was involved and that it would be common sense to wait until that case was decided. The case to which he referred is Mapp v. Board of Education of Chattanooga, 6 Cir., 319 F.2d 571. We held in that case that the assignment of teachers by race may impair the students' rights to an education free from any consideration of race. Therefore, it was a proper question to be raised and determined in a case brought by students and their parents. So, in this case, we hold that it is not a question of the rights of teachers but of the rights of students that are affected. The question may be properly raised in this case. See Board of Public In-

struction of Duval County, Florida v. Braxton, 326 F.2d 616, 620, C.A. 5.

It is our understanding that under the bi-racial plan of operating the schools Negro teachers were assigned to Negro schools and white teachers were assigned to white schools. Under desegregation, both Negro and white teachers will be assigned to bi-racial classes. We do not know to what extent this will affect desegregation of the teaching staff. This, together with a unitary employment policy, are questions to be considered by the trial judge along with other questions concerning the assignment of teachers.

If the appellants' motion for discovery were granted, it would impose a great burden on the administrative staff of the school to assemble all of the information from the documents and records which the appellants request. We are not informed as to why each item of information is needed, except to enable the appellants to prepare plans for teacher desegregation. It should be first determined if there is teacher segregation and, if so, whether it is a violation of the appellants' constitutional rights. This, in the first instance, is the function of the district judge. If he finds that constitutional rights are violated in this respect he should order the Board to submit a plan for the proper assignment of teachers. This, in the first instance, is the Board's function.

We conclude that the issues of assignment of teachers on a desegregated basis and a unitary employment policy are proper ones to be determined in this action. "Within his discretion, the District Judge may determine when, if at all, it becomes necessary to give consideration to the question under discussion." Mapp v. Board of Education of Chattanooga, 6 Cir., 319 F.2d 571, 576. We find no error on the part of the trial judge in denying the motion for production of documents and records on the ground of timeliness.

The case will be remanded to the District Court for further proceedings consistent with this opinion.

*APPENDIX*

PLAN OF DESEGREGATION

I. The following procedures shall govern the operation of the school system for the school year commencing September 1, 1962:

A. A plan of school zoning or districting based upon the location of school buildings with a single geographical boundary line for each school based on the latest scholastic census will be immediately established for admission to grades 1, 2 and 3.

B. All students new to the school system in grades 1 through 3 may register in the school of their choice, even though such registration may be in a school other than that within the geographical boundaries referred to above. Assignments will then be made by the Board of Education on the basis of the geographical boundaries described in Section A. However, if the school chosen by the students new to the system in grades 1 to 3 is not within the school zone of the residence of the student but said school has sufficient facilities for caring for the students so enrolled, the Board of Education may at its option assign such students to the school chosen by the students. Any parents dissatisfied with assignments made by the Board of Education may make application for transfer. Such applications shall be processed under the pupil assignment law.

C. All Negro pupils who elected to attend desegregated schools last year may remain in the desegregated schools which they have previously attended.

D. The transfer applications made by second and third grade Negro pupils in the current school year to attend open schools heretofore attended predominantly by white students shall be approved.

E. The assignment of all other pupils to the school system made in June, 1962, for the school year 1962–63, together with such transfers as the Board of Education has approved, including those applications described in Paragraph D. above, will be allowed to stand. At the end of the school year commencing September, 1962, assignments of pupils in grades 1 through 4 for the school year commencing September, 1963, will be made in accordance with single geographical school zone lines established for each school.

II. For the school year beginning September 1, 1963, Grades 1, 2, 3 and 4 of all elementary schools in the Memphis Public School System shall be desegregated by the establishment of single school zone lines for said grades in each elementary school. Each year thereafter an additional grade in all schools shall be desegregated. As successive grades are desegregated, non-racial school zone lines will apply to all grades which are desegregated.

III. A plan of school zoning or districting based upon location of school buildings and the latest scholastic census will be established for the admission and assignment of students in grades 1, 2, 3 and 4 effective before the end of the school year beginning September, 1962. As successive grades are desegregated such non-racial zone lines shall be created or extended for the successive grades. Said single school attendance areas shall be on a geographic basis according to the capacity and facilities of the buildings and other factors important to the efficient operation of a public school system. Each pupil residing within the zone shall be assigned to and shall have the right to attend the school within his zone so that attendance areas based on race shall be eliminated. The Board of Education retains the right to modify or change such school zone lines in order to make economical use of its facilities.

IV. For the school year commencing September, 1963, each student entering grades 1 through 4 and the remaining grades in successive years will be permitted to attend the school designated for the zone in which that student resides, subject to regulations that may be necessary in particular instances. Such regulations will be based upon factors such as pupil-teacher ratio, classroom availability, and other factors not related to the race of the pupils.

V. The Pupil Assignment Law and Board of Education policies and regulations will govern pupil assignments and transfer applications. In schools where bi-racial assignments may occur as a result of the establishment of unitary non-racial school zones, the parents of all students attending or eligible to attend such school shall have the right to apply for a transfer of their children to any open school regardless of the race of the student seeking such transfer or the racial composition of the school to which transfer is sought.

VI. In instances of patent need for a particular course of study, the Board of Education may entertain applications for transfer under the Pupil Assignment Law for students in grades other than those grades which are desegregated under this plan of desegregation to the end that no student will be denied the right to obtain the best education which that pupil is capable of attaining. The Board of Education reserves the right to accelerate this Plan of Desegregation at such time as circumstances and conditions permit.