Jo Ellen CHRISTMAS and Joel L. Christmas, minors, by their mother and next friend, Mary E. Christmas, et al., Plaintiffs,

v.

BOARD OF EDUCATION OF HARFORD COUNTY, MARYLAND, Charles F. Reed, Mrs. Jason H. Pate, Mrs. Robert Fletcher, Clark Connellee and Thomas Galbreath, Members of the Board of Education of Harford County, and Charles W. Willis, Superintendent of Schools of Harford County, Maryland, Defendants.

Civ. No. 15532.

United States District Court
D. Maryland.

June 23, 1964.

Juanita Jackson Mitchell and Tucker R. Dearing, Baltimore, Md., and Frank H. Heffron, New York City, for plaintiffs.

John F. King, Baltimore, Md., and Edward C. Wilson, Jr., Bel Air, Md., for defendants.

THOMSEN, Chief Judge.

In this class action filed on May 1, 1964, Negro plaintiffs seek an injunction restraining defendants, the Board of Education of Harford County and the Superintendent of Schools, from: (A) refusing to adopt and implement a plan providing for the elimination of segregated schools in Harford County by September 1964, rather than in four steps ending September 1967, as proposed by defendants; (B) discriminating on the basis of race in hiring new teachers; and (C) continuing to assign Negro teachers exclusively to Negro schools solely on the basis of race.

The background of the case is set out in Moore v. Board of Education of Harford County, D.Md., 146 F.Supp. 91 (1956), Moore v. Board of Education, D.Md., 152 F.Supp. 114 (1957), aff'd sub nom. Slade v. Board of Education, 4 Cir., 252 F.2d 291 (1958), cert. den. 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157, and Pettit v. Board of Education, D.Md., 184 F.Supp. 452 (1960). Briefly, a modified plan for the desegregation of the Harford County schools was approved by this Court in the second Moore case, affirmed by the Fourth Circuit in Slade. It pro-

vided for step by step desegregation, with transfer of qualified students in high school grades during the transition period. The plan was found still acceptable by this Court in Pettit, from which no appeal was taken. Thereafter the Board of Education accelerated the plan by one year, so that from September 1962 to the end of the 1963–64 school year in June 1964, the situation described in the paragraph from Pettit, set out in note [1] has applied in all grades, and will apply until the new plan adopted by the Board in March 1964 takes effect, except as modified by the new plan or by court order.

During the transition period certain restrictions were placed on transfers, but since 1962 Negro children have been able to transfer to another school or to enter any school on the same basis as white children.[2]

The experience under the plan has shown that some Negro parents desire their children to attend desegregated schools, while some prefer them to attend schools where all the pupils and teachers are Negroes. There are about 19,000 pupils in the Harford County schools, of whom about 2,100 are Negroes. During the last school year 500 out of the 1,100 had entered or transferred to formerly white, now desegregated schools; the remaining 1,600 attended the Central Consolidated School, near Bel Air, or the Havre de Grace Consolidated School, both of which are staffed and attended solely by Negroes.

No Negro teachers have ever been transferred to or engaged to teach in the formerly white, now desegregated schools, and no white teachers have been assigned to the Negro schools.

(A)

Various groups and individuals in Harford County have been urging the complete desegregation of the county schools by the elimination of the two consolidated schools. In the summer of 1963 the Board of Education appointed a committee of teachers, principals and

1. "In Harford County, as in many other Maryland counties, there are now two sets of attendance areas, which were originally based on race. Each child, Negro or white, lives in what was formerly a white district served by a particular elementary school, and also in what was formerly a colored district served by a particular school. Before desegregation the white child was required to enter the white school serving his district, the Negro child the appropriate colored school. Now, however, the Negro child may enter either school—the formerly white school serving the district in which he lives or the formerly colored consolidated school serving a somewhat wider district. A white child has exactly the same option. No tests or other 'factors' are prescribed or considered in admitting either Negro or white children to the several schools. In the Moore case, this Court said: 'It was made clear that when an elementary school has been desegregated, all Negro children living in the area served by that school will have the same right to attend the school that a white child living in the same place would have, and the same option to attend that school or the appropriate consolidated

school that a white child will have. The same rule will apply to the high schools, all of which operate at both junior high and senior high levels, as they become desegregated, grade by grade. Of course, the County Board will have the right to make reasonable regulations for the administration of its schools, so long as the regulations do not discriminate against anyone because of his race; the special provisions of the June 5, 1957 resolution will apply only during the transition period.' 152 F.Supp. at pages 117–118, affirmed 252 F.2d at pages 291–292. The County Board may make reasonable regulations governing the transfer to another school of a child who has already entered one school, provided those regulations are made for proper administrative or educational reasons, and do not discriminate against anyone because of his race." 184 F.Supp. at 457.

2. The fatal defects which were found in the transfer provisions in Goss v. Board of Education of Knoxville, Tenn., 373 U.S. 683, 688, 689, 83 S.Ct. 1405, 10 L. Ed.2d 632, and in Buckner v. County School Board of Greene County, 4 Cir., 332 F.2d 452, May 25, 1964, are not present here.

supervisors, who met twelve times, considered various proposals, and in February 1964 recommended a plan under which the schools would be completely desegregated by the elimination of the two Negro schools in four phases, as follows:

1. The discontinuance of the ninth grade [3] courses in the Negro schools in September 1964, together with the transfer of each ninth grade pupil to the desegregated junior high school servicing his neighborhood, and the transfer of selected Negro high school teachers to positions for which they are qualified in desegregated high schools.

2. Similar action with respect to the remaining senior high school grades in September 1965, together with the reassignment of all Negro teachers affected thereby.

3. Elimination of all first grade classes in the Negro schools in September 1966, the registration of each first grader, regardless of race, in the desegregated elementary school which serves his neighborhood, together with the reassignment of Negro teachers affected thereby.

4. Complete desegregation in September 1967, when the Negro schools will become neighborhood schools with attendance areas similar to those prescribed for other schools of similar size, each child will attend the neighborhood school serving his attendance area, and all teachers in the public schools of Harford County will be assigned in accordance with the concept of total desegregation and the policy statement attached to the plan.

The general policies referred to and included in the report include those set out in note.[4] The report stated that the ad-

---

3. The ninth grade is the first year of senior high school, since the Harford County schools now operate on a 6–2–4 basis.

4. " *          *          *          *          *

"2. Fully cognizant that problems may arise in desegregated schools, the Board of Education of Harford County expects its employees to work to prevent problems before they arise and to solve quickly and judiciously those which do occur.

"3. The Board of Education of Harford County, in recognition of its responsibility to provide the best possible education for each child regardless of race, instructs those responsible to plan all educational programs in the expectation of and in the furtherance of desegregated schools. Furthermore, the Board of Education wishes to be apprised of all special educational problems and needs arising out of its plan of desegregation.
" *          *          *          *          *

"5. As the Plan for Desegregation progresses and becomes complete, desegregation of the transportation of pupils shall likewise progress and be completed.

"6. The Board of Education of Harford County instructs the Personnel Department to correlate the desegregation of the current teaching staffs with the Plan for Desegregation and, in addition, to consider some Negro teachers for transfer into elementary schools during the 1964–1965 and 1965–1966 school years. Negro teachers are, insofar as possible,

to be placed in assignments for which they are well suited in preparation and previous experience. (The Committee feels that Negro teachers should be carefully selected for initial transfer. This does not, however, preclude a teacher's applying for and receiving a transfer.)

"The ultimate employment policy shall be to recruit, employ, assign, and promote all teachers in accordance with published personnel policies and without regard to race.
" *          *          *          *          *

"8. The Board of Education of Harford County will limit or discontinue the application for transfer policy during the interim. (Should the Board of Education be legally bound to continue this policy, transfers should not be authorized in instances where the impact will create undesirable educational situations for the children and obstruct or impede the plan for the desegregation of schools.)

"Present policies pertaining to first graders and new enrollees at any grade level will be continued until obviated by the plan.

"9. The Board of Education of Harford County will maintain a quality program of instruction, suitable course offerings, and essential services in all schools during the process of desegregation. (The Committee recommends that the Board of Education be mindful of the possible need for additional services at the schools as a result of the program of desegregation.)

vantages of the proposed plan included the items set out in note.[5]

The Board of Education adopted the plan in March 1964, by a vote of three to two. The President of the Board favored the adoption of a speedier plan, eliminating the third step and certain statements of policy which he felt were offensive to some Negroes.

The decision to limit or discontinue during the interim the application of the existing policy for pupil transfers (item 8 in note 4) met with instant opposition; it was promptly changed, on advice of counsel, and the existing policy was reinstated before this suit was filed. An additional 340 Negro pupils have requested transfers for the year 1964–65; all of the requests have been granted.[6]

Nevertheless, the complaint filed herein on May 1, 1964, contained a prayer that defendants be restrained from "refusing to adopt and implement a plan providing for the elimination of segregated schools by September 1964, or in the alternative, from refusing to allow transfers in all grades from the Central Consolidated School and the Havre de Grace Consolidated School in 1964–65 and subsequent schools years".

At the trial, plaintiffs pressed their demand for the complete elimination of the Negro schools in September 1964 despite the fact that their alternative demand had been met by the modification of the plan and the granting of all 340 requests for transfer. Defendants contend that the plan is fair and educationally desirable, and that it complies with the constitutional requirements prescribed by the controlling authorities.

█ Both sides have cited cases in support of their respective positions. Each case presents its own facts, and each plan must be considered in the light of the situation in the particular school district involved. The applicable authorities do not require immediate and complete elimination of Negro schools in every case. Harford County has lived up to, indeed has accelerated, the plan approved by this Court and the Fourth Circuit. Without further court action, the Board of Education has proposed a new, four-phase plan leading to the elimination of all segregated schools by September 1967. Good reasons for some delay and for some parts of the plan have been presented to the Court. The opening this fall of the ninth grade in the first Catholic high school in Harford County, and the opening of the tenth grade therein next fall, will aid the problem of overcrowding in some of the public high schools, and is a reason for handling the high school transfers in two steps. A delay in the transfer of other grades than the ninth will permit in-service training programs for both Negro and white teachers, who have never had the experience of teaching desegregated classes. The transfer this fall of a num-

5. "Each Negro pupil below ninth grade will receive the advantages of the diversified curricula of a larger high school.

"The initial transfer of Negro teachers at the high school level offers opportunities for teacher satisfaction and success.

"General acceptance of the competent Negro teacher at the high school level seems likely.

"This plan can be applied throughout the county without exception.

"Projected enrollment figures for Negro schools indicate defensible utilization of facilities during the interim.

"The Board of Education will be provided time to plan facilities at the elementary level where the problem of overcrowding currently precludes the possibility of enrolling more pupils in some schools.

"The pattern of teacher transfer seems to be satisfactory.

"This plan requires minimal overstaffing in the two Negro schools during the interim.

"The plan is carefully coordinated with the existing facilities and currently proposed construction.

"Negro high school pupils will be rather evenly distributed among the high schools of the county during the first two years."

6. Other Negroes will no doubt enter the first grade in formerly white, now desegregated schools in the fall of 1964, so at that time more than 40% of the Negro children in Harford County will be attending desegregated schools.

ber of Negro elementary teachers to the formerly white, now desegregated schools, will enable them to participate helpfully in such programs.

One of the reasons plaintiffs seek the elimination of the Negro schools is that some courses, especially science courses, in the Negro schools are less advanced than similar courses in the desegregated schools. The proposed delay in the total elimination of the Negro schools has not prevented and will not prevent those who wish the richer curriculum from transferring promptly to the desegregated schools. On the other hand, it will permit special courses or programs in the Negro schools during the year 1964–65 to ease the transfer problem for some slow Negro students who did not wish to transfer but who, after transfer, will be forced to compete with students, both Negro and white, who have heretofore chosen the more advanced curriculum and have become accustomed to the greater pressures.

■ One reason advanced for transferring all the high school pupils first is that the pupils in those grades meet several teachers each day, while the pupils in the elementary grades have the same teacher all day. This reason has some educational and administrative merit, but it must be recognized that "constitutional rights may not be denied simply because of hostility to their assertion or exercise." Watson v. City of Memphis, 373 U.S. 526, 535, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529. See also Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19; Jones v. School Board of City of Alexandria, Va., 4 Cir., 278 F.2d 72, 76; Northcross v. Board of Education, 6 Cir., 333 F.2d 661, June 12, 1964.

The report stated that the plan is carefully coordinated with existing facilities and currently proposed construction. See note 5 above. This point was neither supported nor challenged by testimony at the trial.

■ After considering all the circumstances shown by the evidence, the Court is satisfied that the complete elimination of all grades in the two Negro schools in September 1964 should not be required. However, it does not follow that the Court should approve the entire plan at this time. No legally acceptable reason has been presented for including the third phase—the elimination of only one grade (the first grade) in the Negro schools in the fall of 1966, and postponing the elimination of the other elementary grades until 1967. The President of the Board and counsel for defendants have both stated their belief that the plan will probably be accelerated; indeed, it appears to the Court that if another large group of Negro children seek transfers next spring it may well be impracticable to operate the school system on anything but a completely desegregated basis thereafter. Much will be learned during the coming school year as a result of the transfer of all ninth grade pupils and the transfer to the desegregated schools of some Negro teachers, at the elementary as well as the high school level. The Court will therefore postpone final approval or disapproval of the proposed plan until next spring, when the Court will hear additional evidence, and will consider any proposed modifications to the plan which may be presented at that time.

### (B)

■ The complaint seeks an injunction against discrimination on the basis of race in hiring new teachers. That is a proper matter for consideration by the Court in this case. Board of Public Instruction of Duval County, Florida v. Braxton, 5 Cir., 326 F.2d 616, 620; Northcross v. Board of Education of the City of Memphis, 6 Cir., 333 F.2d 661, June 12, 1964.

The plan adopted by the Board on March 4, 1964, contains the following statement under the heading "General Policies": "The ultimate employment policy shall be to recruit, employ, assign, and promote all teachers in accordance

with published personnel policies and without regard to race." [7]

There were 808 teachers in the Harford County schools in the 1963–64 year, of whom 74 were Negroes, all assigned to the two consolidated schools. There is a very heavy turnover of white teachers, a considerable number of whom have been selected from among the wives of military and civilian personnel assigned to the Aberdeen Proving Grounds or the Chemical Center at Edgewood. Competent Negro teachers also are available from those sources.

Teachers are appointed by the Board on the recommendation of the Superintendent. Anno.Code of Md., 1957 ed., Art. 77, sec. 64. At the meeting of the Board on June 4, 1964, in spite of the statement of policy quoted above and the fact that there will be more than 800 Negro children in the desegregated schools this fall, the Board appointed 95 white teachers and no Negro teachers. Later in that meeting the Board amended its printed policy on employment procedures to read as follows (new material in italics):

"The bases for employment in Harford County are: college transcripts, supporting references, personal interviews, and, if at all possible to obtain, the grades from the National Teacher Examinations. *All candidates are considered for employment, assignment, and promotion on the bases of merit, qualifications, and performance, and without regard to race.*"

Since June 4, 1964, despite the fact that the staff expects that about 45 more teachers will have to be hired before the reopening of the schools in September 1964, and the fact that 45 Negroes with the requisite educational preparation have applied for appointment, the staff has engaged, subject to election by the Board, 15 white teachers and no Negro teachers.

It is evident that ever since the first Negro pupils were admitted to the formerly white schools in 1957, the Board of Education of Harford County has been discriminating on the basis of race in hiring new teachers, and is still discriminating. Nevertheless, defendants urge that no injunction be issued, stating that they will apply the June 4, 1964, policy in good faith. However, the failure to hire a single Negro applicant for the desegregated schools, although the qualifications of some of these applicants are obvious and admitted, justifies plaintiffs' skepticism, and requires that an injunction be issued prohibiting discrimination on the basis of race in hiring new teachers. No quota system is urged or required, and the same criteria may be considered in hiring Negro applicants that are considered in hiring white applicants.

## (C)

The complaint also seeks an injunction restraining defendants from "continuing to assign Negro teachers to Negro schools solely on the basis of race". The plan adopted by the Board calls for the reassignment of Negro teachers as the desegregation process develops, and instructs the Personnel Department "to consider some Negro teachers for transfer into elementary schools during the 1964–1965 and 1965–1966 school years". The policy statement continues:

"Negro teachers are, insofar as possible, to be placed in assignments for which they are well suited in preparation and previous experience. (The Committee feels that Negro teachers should be carefully selected for initial transfer. This does not, however, preclude a teacher's applying for and receiving a transfer.)"

Then follows the statement of the ultimate employment policy quoted and discussed under "(B)", above.

The assignment of teachers, as distinguished from the original hiring, is made by the Superintendent, on the recommendation of the Personnel Department, usually with the approval of the

---

7. Included in item 6, note 4, above.

principals involved if a teacher is being transferred from one school to another. Anno.Code of Md., 1957 ed., Art. 77, sec. 153.

The Superintendent testified that he intends to assign eight Negro teachers to the desegregated schools for the year 1964–65—six in the high schools and two in the elementary schools. The Court does not approve or disapprove at this time the number to be transferred. Its fairness depends on several factors, including the number of new Negro teachers who may be employed and assigned to the desegregated schools.

The Superintendent testified that the following factors have influenced the selection of the teachers to be transferred this fall: competency in the classroom; professional attitude; whether the teacher is working up to his full capacity; preparation; language factors and patterns; personality; cultural background; ability to accept responsibility, initiative; acceptance of authority; loyalty to the system. These criteria for selecting the first teachers to be transferred do not violate constitutional rights if they are fairly applied. Different criteria with respect to assignments will apply when the Negro schools are completely eliminated, in accordance with the plan or by possible future modification of the plan or court order. Different criteria may also have to be applied during the remainder of the transition period, however long or short it may be.

Janice Grant, one of the plaintiffs, has applied for transfer from a Negro school to a desegregated school during each of the past six years. Her request has always been denied, and the Superintendent does not intend to include her among the first group of Negro teachers to be assigned to desegregated schools. Mrs. Grant asks the Court to require defendants to assign her to a desegregated school in September 1964. She contends that the refusal to transfer her is due to her activity in the civil rights movement. She testified that she has been working with the NAACP,

CORE, Freedom Riders and others in Baltimore City and Baltimore County, as well as in Harford County. She participated in a meeting of Negro teachers during school hours; the evidence is not clear as to the extent of her responsibility for the meeting. When told by a superior that such a meeting during school hours was improper, she said that she would continue to participate in anything that would help advance the Negro.

The Court refuses to require that Mrs. Grant be transferred this fall for three reasons:

(1) The Superintendent has not yet finally assigned any particular Negro teachers to the desegregated schools, although he has selected them and is making arrangements for their assignment, and has not yet finally decided to deny Mrs. Grant's application. The Court rules and declares that the Superintendent must consider her application and that he must not deny it merely because Mrs. Grant has asserted her constitutional rights or because she has engaged in demonstrations in support of existing or proposed civil rights. On the other hand, the Superintendent may consider whether in the course of such demonstrations Mrs. Grant has violated any valid, constitutional law. The use of illegal means to bring about social or legal changes goes beyond the protection of the First and Fourteenth Amendments. Such activities, however admirable from many points of view, may properly be considered by public authorities in determining fitness for certain positions. The use of illegal means to *resist* social or legal changes should also be considered by public authorities in determining fitness for similar positions. Specifically, the Court rules that in deciding whether or not Mrs. Grant should be assigned to a desegregated school this fall the Superintendent may apply the criteria he has outlined, provided he applies them fairly, and does not violate the principles declared by this Court. The Court ought not to dictate the individual teachers who should or should not be assigned to a particular school or who should or

should not be included in the first group of Negro teachers to be transferred. Carson v. Board of Education of Mc-Dowell County, 4 Cir., 227 F.2d 789. See also Dodson v. School Board of City of Charlottesville, 4 Cir., 289 F.2d 439.

■ (2) From the action of the Superintendent in assigning teachers, an administrative appeal lies to the State Board of Education, not to the County Board. Anno.Code of Md., 1957 ed., Art. 77, secs. 21, 150; Robinson v. Board of Education of St. Mary's County, D.Md., 143 F.Supp. 481; West v. Board of Education of Prince George's County, D. Md., 165 F.Supp. 382. See also Pettit v. Board of Education, supra, 184 F. Supp. at 459. It is quite clear that under the Maryland law discussed in those cases, both administrative and legal questions may well be involved in the ultimate decision of the Superintendent, and that such decision may be one which should not be reviewed by this Court until available administrative remedies have been exhausted. See Robinson and Pettit, supra. This is not a case where the administrative remedy is inadequate or would be ineffective. Cf. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622; Marsh v. County School Board of Roanoke, Va., 4 Cir., 305 F.2d 94. Prompt relief in analogous cases has been granted in the past. But the question whether this Court should require the exhaustion of administrative remedies in this instance is premature. It may arise later this summer.

(3) This is a class suit, in which no prayer for special relief for Mrs. Grant ahead of other members of her class was prayed. She has asked leave to amend the complaint to include a prayer for such individual relief. Leave to do so will be granted, but defendants will have the usual time to file responsive pleadings to the amendment, which will be treated as a supplementary petition filed herein.

### Conclusion

Counsel should prepare a decree embodying the injunctive relief discussed in "(B)" above, and providing that the Court retain jurisdiction of the case for such further relief as may be proper. Any of the parties may file supplementary petitions herein, and other persons may file intervening petitions. The decree should provide that defendants may move to vacate the injunction after a period of five years, upon a showing of compliance therewith.