UNITED STATES of America,
Plaintiff,

v.

SCHOOL DISTRICT 151 OF COOK
COUNTY, ILLINOIS; Charles Watts,
Superintendent of School District 151;
Richard Graf, Wallace Davis, Louis
Wiersma, Gerald Bennett, James Hen-
drix, Donald McGee and Hobart Krillic,
Members of the Board of Education of
School District 151 of Cook County, Illi-
nois, Defendants.

No. 68 C 755.

United States District Court
N. D. Illinois, E. D.

July 8, 1968.

Thomas A. Foran, U. S. Atty., Jack B. Schmetterer, Asst. U. S. Atty., Chicago, Ill., J. Harold Flannery, Robert Pressman, Asst. Attys. Gen., Dept. of Justice, Ramsey Clark, Atty. Gen., Dept. of Justice, Washington, D. C., for plaintiff.

Louis Ancel, Marvin J. Glink and Ronald M. Glink, Chicago, Ill., John Merrill Van Der Aa, South Holland, Ill., for defendants.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, District Judge.

This matter is before the court this morning for the disposition of the plaintiff's motion for a preliminary injunction under the provisions of Rule 65 of the Federal Rules of Civil Procedure. The cause has been fully tried, briefed and argued and the court has had the benefit of a transcript of the evidence together with all of the documentary and physical exhibits offered by the parties and admitted into evidence by the court.

The action involves alleged school segregation and is brought under the provisions of Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq. The court has determined that the plaintiff is entitled to the relief sought based on the facts as they have been found by the court and the applicable law and an injunction will issue against the defendants which will insure that no longer will there be discrimination on the basis of race in the operation of School District 151 for the 1968–1969 school year and thereafter.

It is more than fourteen years since the Supreme Court ruled that "in the field of public education the doctrine of 'separate but equal' has no place." It is more than thirteen years since the Court said that desegregation should proceed "with all deliberate speed." Too often there has been deliberation but no speed. There has not even been a beginning in some cases, despite increasing and well documented evidence showing that racial segregation in the schools has been detrimental to the Negro child, the white child, and to the United States.

School segregation, whatever the cause, has the effect of stigmatizing Negro pupils and retarding their educational development. The mere fact of separation encourages invidious comparison; and the false conclusion that the Negro pupil is inferior to the white pupil is tragically forced on the black child himself through constant elaboration and repetition. He sees white parents re-moving their children from his vicinity as if to protect them from contagion, and he sees school boards and administrators creating separate isolation wards to contain him. The absence of white teachers is an added affront. If poverty has prevented him from obtaining cultural and educational experiences that promote the development of children who have economic and social advantages, he generally scores below the average in standard achievement tests. Unless he receives significant remedial instruction he continues to limp along one, two, or three years behind his grade level, not expected to catch up and therefore not motivated to do so. Robbed of incentive, self-confidence, and self-esteem, he is in grave danger of becoming another battered child, for just as physical abuse batters the body, so psychological injury can batter the personality.

Not unnaturally, a child so afflicted becomes a drop-out and a drifter. Even the one who finishes school has been conditioned to believe that the future holds nothing better for him than a menial job. This represents an unconscionable theft of a child's birthright and a waste of human resources which could be of great value to the nation.

Though integration does not automatically raise the Negro student's grades, it provides an atmosphere in which he finds that they can be raised and that there is good reason for raising them. He is stimulated and motivated by contact with teachers who expect him to succeed and with pupils who know by example, as many Negro children do not, that education leads to job opportunity and a chance of a good life.

The white opponents of pupil and faculty integration, on the other hand, are doing a disservice to their own children when they deprive them of the opportunity to know members of another race and to be saved from the ignorant, arrogant belief that a white skin is proof of preeminence. The white child's education is woefully inadequate if it does not illuminate those dark corners of the mind in which prejudice lurks. Both

white and black children are being misled when they are told, directly or by implication, that it is best for them to be taught only by members of their own race. They are being cheated when they are deprived of the experience of working together and learning about one another in school as preparation for life in an inter-racial world of adults.

Barriers to understanding not only cripple the individual but also endanger the nation. Clearly, the future of the United States depends in no small part on education—not the education of white children but the education of all children. We do not need another fact-finding commission to tell us that something must be done to prevent a school situation which produces apathy and hopelessness that cause a life to be wasted, or frustration and anger that cause it to be risked in public disorders. It is not rational to maintain a situation which is conducive to the kind of behavior that we must prevent or to expect schools to produce law-abiding citizens in a school system that flouts the law. School boards and school administrators have a moral and civic duty as well as a legal duty to end segregation. To fail the Negro child would be to fail the nation.

An order providing that the defendants, their agents, officers, employees and successors, and all those in active concert and participation with them, be preliminarily enjoined from discriminating on the basis of race or color in the operation of School District 151 and in the assignment of teachers or students in the district will be entered. This order will be based on the findings of fact and conclusions of law filed here today by the court in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1. School District 151 is an elementary public school district organized and existing under the laws of the State of Illinois. It is located in Cook County, Illinois, and consists of portions of the communities of Phoenix, Thornton, Harvey, and South Holland. Appendix A to these findings is a map of School District 151. (Tr. 153 (Kingsland); Govt. Ex. P–4; Answer, para. 3)

2. Charles Watts is Superintendent of School District 151. Richard Graf, Wallace Davis, Louis Wiersma, Gerald Bennett, James Hendrix, Donald McGee and Hobart Krillic are the members of the Board of Education of School District 151. Under the laws of the State of Illinois and the Policy Manual for District 151, the members of the Board of Education and the Superintendent are charged with the responsibility of operating the public schools of District 151. (Answer, para. 6; Ill.Ann.Stat., Ch. 122, Sec. 10–21.4; Policy Manual for District 151.)

3. The following table lists the schools located in School District 151, the dates of their initial utilization, and their locations:

| Schools | Date of Initial Use | Location |
|---|---|---|
| Roosevelt | 1931 | 320 E. 161st Pl., S. Holland |
| Coolidge | 1933 | 155th St. and 7th Ave., Phoenix |
| Madison | 1957–58 | 157th St. & Orchid Dr., S. Holland |
| Eisenhower | 1960–61 | 16001 Minerva Ave., S. Holland |
| Taft | 1966–67 | 163rd St. and Union, Harvey |
| Kennedy | 1966–67 | 155 St. and 8th Ave., Phoenix |

The Roosevelt, Madison, Eisenhower and Taft Schools serve grades kindergarten through eight. The Kennedy School serves grades kindergarten

through three and the Coolidge School serves grades four through eight. The Kennedy and Coolidge Schools are separate buildings located adjacent to each other. (Govt. Ex. C–5; D–18, pp. 3, 13; D–19, pp. 10, 12; P–3; P–4; Tr. 170, 197, 224, 238 (Kingsland); Tr. 744 (Watts))

4. Approximately 98% of the residents of the Village of Phoenix are Negro. The part of Phoenix in School District 151 is bounded on the north by 151st Street, on the west by Halsted Street, on the south by the Gulf Trail Railroad tracks and 155th Street, and on the east by 9th Avenue and Van Drunen Road. No Negroes reside in any area of School District 151 other than in the community of Phoenix. (Tr. 153, 175 (Kingsland); Govt. Ex. P–4)

5. No Negro student has ever attended the Madison or Eisenhower schools. No Negro student has ever attended Roosevelt School during the regular school year. Negroes have attended summer school sessions at Roosevelt. No Negro student has attended the Taft School, except for approximately ten mentally handicapped students ("special education classes") during the 1967–68 school year. Mentally handicapped students are assigned to school without regard to residence. (Tr. 154–157 (Kingsland); Tr. 289 (McGovern))

6. In 1948, the enrollment of the Coolidge School was approximately 70% white. As of the 1956–57 school year, and thereafter, the enrollment of the Coolidge School was approximately 99% Negro. The enrollment of the Kennedy School has been almost entirely Negro for 1966–67 and 1967–68, the two school years of its operation. During the 1967–1968 school year, the students at Coolidge and Kennedy were approximately 99% Negro. There were approximately 10 or 12 white children in these schools, and some of these were mentally handicapped children assigned to the schools without regard to residence. (Tr. 154–

55 (Kingsland); Tr. 289–291, 296 (McGovern) Tr. 748–9 (Watts))

7. Total student enrollment at District 151 schools during the 1967–1968 school year (April, 1968) is shown on the following table:

| Coolidge | 426 |
| Kennedy | 396 |
| Roosevelt | 452 |
| Madison | 445 |
| Eisenhower | 622 |
| Taft | 308 |

(Gov't. Ex. A–19)

8. When George Kingsland became Superintendent in School District 151 in 1948, all teachers employed in the District were white. The first Negro teacher in School District 151 was Huel Gwin, who was employed at the Coolidge School for the 1953–54 school year. During the 1964–65 school year, a Negro music teacher and a Negro permanent substitute teacher taught in all schools in the District. These teachers were the first Negro teachers assigned to teach in School District 151 in schools other than Coolidge. (Tr. 151, 160, 180–1, 186–7 (Kingsland); Tr. 294, 313 (McGovern); Gov't. Ex. D–12, p. 4; F–3, p. 56; F–4, p. 1; R).

9. Before the 1966–1967 school year, no full-time Negro classroom teacher was employed in the Roosevelt, Madison, Eisenhower or Taft Schools. One Negro classroom teacher was employed in each of these schools on a full-time basis for the 1966–1967 school year, as the result of a decision by the Board of Education to have one Negro teacher for each of these schools for that year. Two Negro classroom teachers were employed at the Roosevelt, Eisenhower and Taft Schools for the 1967–1968 school year and one at the Madison School. In addition, one Negro teacher's aid was employed at the Taft School for that year. (Tr. 292–3 (McGovern); Tr. 163–5, 192–3 (Kingsland); Tr. 521–3 (Bogolub); Gov't. Ex. R; Gov't. Ex. O–1, pp. 5–6 (McGovern); Gov't.'s Ex. C–4, C–5).

10. The number of full-time teachers, by race, employed at each of the schools in the District between the years 1953 and 1968 is shown on the following table:

| | | Faculty | | |
|---|---|---|---|---|
| Year | School | White | Negro | Race Unknown |
| 1953–54 | Roosevelt | 12 | 0 | 0 |
| | Coolidge | 7 | 1 | 1 |
| 1954–55 | Roosevelt | 15 | 0 | 0 |
| | Coolidge | 8 | 2 | 1 |
| 1955–56 | Roosevelt | 17 | 0 | 0 |
| | Coolidge | 9 | 3 | 0 |
| 1956–57 | Roosevelt | 18 | 0 | 0 |
| | Coolidge | 9 | 5 | 0 |
| 1957–58 | Roosevelt | 20 | 0 | 0 |
| | Coolidge | 6 | 9 | 0 |
| | Madison | 6 | 0 | 0 |
| 1958–59 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 6 | 12 | 0 |
| | Madison | 13 | 0 | 0 |
| 1959–60 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 2 | 17 | 0 |
| | Madison | 16 | 0 | 0 |
| 1960–61 | Roosevelt | 19 | 0 | 0 |
| | Coolidge | 0 | 22 | 0 |
| | Madison | 16 | 0 | 0 |
| | Eisenhower | 8 | 0 | 0 |
| 1961–62 | Roosevelt | 20 | 0 | 0 |
| | Coolidge | 0 | 25 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 9 | 0 | 0 |
| 1962–63 | Roosevelt | 21 | 0 | 0 |
| | Coolidge | 0 | 26 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 17 | 0 | 0 |
| 1963–64 | Roosevelt | 23 | 0 | 0 |
| | Coolidge | 0 | 25 | 0 |
| | Madison | 16 | 0 | 0 |
| | Eisenhower | 14 | 0 | 0 |
| 1964–65 | Roosevelt | 24 | 0 | 0 |
| | Coolidge | 1 | 28 | 0 |
| | Madison | 17 | 0 | 0 |
| | Eisenhower | 16 | 0 | 0 |

|  |  | Faculty | | |
| Year | School | White | Negro | Race Unknown |
| --- | --- | --- | --- | --- |
| 1965–66 | Roosevelt | 14 | 0 | 0 |
|  | Coolidge | 1 | 12 | 0 |
|  | Madison | 14 | 0 | 0 |
|  | Eisenhower | 12 | 0 | 0 |
|  | Kennedy | 0 | 10 | 0 |
|  | Taft | 5 | 0 | 0 |
| 1966–67 | Roosevelt | 16 | 1 | 0 |
|  | Coolidge | 0 | 16 | 0 |
|  | Madison | 16 | 1 | 0 |
|  | Eisenhower | 17 | 1 | 0 |
|  | Kennedy | 0 | 15 | 0 |
|  | Taft | 8 | 1 | 0 |
| 1967–68 | Roosevelt | 17 | 2 | 0 |
|  | Coolidge | ½ | 21 | 0 |
|  | Madison | 18 | 1 | 0 |
|  | Eisenhower | 19 | 2 | 0 |
|  | Kennedy | ½ | 18 | 0 |
|  | Taft | 12 | 2 | 0 |

(Gov't. Ex. R)

---

11. The following table shows the number of vacancies in teaching positions at schools in School District 151 for each school year from 1953–54 to 1967–68 and the racial composition of the teachers filling these vacancies:

| Year | Vacancies or New Positions at Predominantly White Schools | Hired | | Vacancies or New Positions at Predominantly Negro Schools | Hired | |
| --- | --- | --- | --- | --- | --- | --- |
|  |  | W | N |  | W | N |
| 1967–68 | 32 | 29 | 3 | 10 | 1 | 9 |
| 1966–67 | 35 | 31 | 4 | 11 | 0 | 11 |
| 1965–66 | 22 | 22 | 0 | 13 | 0 | 13 |
| 1964–65 | 12 | 12 | 0 | 4 | 1 | 3 |
| 1963–64 | 18 | 18 | 0 | 2 | 0 | 2 |
| 1962–63 | 23 | 23 | 0 | 6 | 0 | 6 |
| 1961–62 | 19 | 19 | 0 | 5 | 0 | 5 |
| 1960–61 | 21 | 21 | 0 | 5 | 0 | 5 |
| 1959–60 | 9 | 9 | 0 | 9 | 1 | 8 |
| 1958–59 | 11 | 11 | 0 | 5 | 1 | 4 |
| 1957–58 | 12 | 12 | 0 | 5 | 1 | 4 |
| 1956–57 | 4 | 4 | 0 | 5 | 3 | 2 |
| 1955–56 | 3 | 3 | 0 | 5 | 2 | 3 |
| 1954–55 | 2 | 2 | 0 | 2 | 1 | 1 |
| 1953–54 | 4 | 4 | 0 | 2 | 1 | 1 |
| Total | 227 | 220 | 7 | 89 | 12 | 77 |

(Gov't. Ex. R.)

12. During the period from September 5, 1967 through February 8, 1968, the defendants assigned substitute teachers on the basis of race. Approximately 75% of the total assignments given to Negro substitute teachers were to the predominantly Negro Coolidge and Kennedy Schools. Of substitute assignments made to predominantly white schools 91% went to white teachers. (Gov't. Ex. S).

13. The present racial composition of the faculties at the schools of School District 151 is the result of a deliberate decision by the defendants and their predecessors in office to assign teachers to schools on the basis of race. With few exceptions, white faculty members have been employed for and assigned on the basis of their race to schools attended only or almost entirely by white students. Negro faculty and staff members have generally been employed for and assigned on the basis of their race to schools attended only or almost entirely by Negro students. (Gov't. Ex. G–1, pp. 184–5; Gov't.Ex. R., S; Tr. 178–191, 246, 250–51 (Kingsland); Tr. 301–305, 307–9, 311–12 (McGovern); Tr. 518–23 (Bogolub); Tr. 694–695 (Gesell)).

14. This assignment policy is responsible, in part, for the fact that the schools in School District 151 are presently identifiable by race. The racial composition of the faculties at the Coolidge and Kennedy schools contributes to making them "Negro schools." The racial composition of the faculties of the Roosevelt, Madison, Eisenhower and Taft schools contributes to making them "white schools."

15. Beginning in the 1940's and continuing until the opening of the Taft School for the 1966–67 school year, white children living in the Harvey Highlands area of District 151 and in the area bounded by Halsted Street on the west, Route 6 on the south and the Grand Trunk Railroad tracks on the northeast were bussed to the Roosevelt School. These two areas are located closer to the Coolidge School than to the Roosevelt School. During the period of this bussing, only white children attended the Roosevelt School, and the enrollment of the Coolidge School became progressively more Negro in character until it was almost entirely Negro. The bussing of these children to the Roosevelt School instead of the Coolidge School was not justified by any safety factor. (See (5) and (6) above; Tr. 196–7, 200–202, 280 (Kingsland; Gov't. Ex. E–1 to E–7; Gov't. Ex. P–3, P–4).

16. Beginning no later than the start of the 1956–57 school year, and continuing through the 1967–68 school year, white children living in the area of District 151, immediately east of the Village of Phoenix, located closer to the Coolidge and Kennedy Schools than to the Roosevelt School, were bussed to the Roosevelt School. The following table shows the number of students so transported for all school years from 1960–61 to 1967–68, with the exception of 1962–63:

| Year | Number Students Bussed |
| --- | --- |
| 1960–61 | 36 |
| 1961–62 | 38 |
| 1963–64 | 33 |
| 1964–65 | 53 |
| 1965–66 | 60 |
| 1966–67 | 68 |
| 1967–68 | 84 |

During the period of such bussing, the enrollment of the Roosevelt School was all-white and that of the Coolidge School and (after its construction) Kennedy School, almost entirely Negro. The bussing of these children to the Roosevelt School instead of the Coolidge and Kennedy Schools was not, and is not, justified by any safety factor. (Tr. 202–9, 210–15, 216–17, 279 (Kingsland); Gov't. Ex. E–2 through E–9; P–3, P–4; Q–6; T–1, T–2 and T–3).

17. Some of the white children bussed to the Roosevelt and Taft Schools lived less than 1½ miles from those schools, and were provided school bus transportation because of safety factors. Although safety factors have been given

as the reason for not assigning white children to the Coolidge and Kennedy schools, no bus service was provided to those schools for white children. (Gov't. Ex. E–8, E–9; P–3, P–4; Gov't. Ex. F–6, pp. 19–23; Tr. 202–9, 210–15, 216–17 (Kingsland).)

18. With the exception of special education students, District 151 has not bussed white children to the Coolidge or Kennedy schools or Negro children to the Roosevelt, Taft, Madison and Eisenhower Schools (See (5) and (6) above; Tr. 745–6 (Watts); Tr. 202–9, 210–15, 216–17 (Kingsland); Gov't. Ex. E–2 through E–9).

19. The purpose and effect of the program of school bus transportation referred to in paragraphs 15 through 18 above has been to segregate the students of School District 151 on the basis of race and color.

20. In February 1964, a referendum was held in School District 151 on a proposal presented by the Board of Education for the construction of a school in the southwest portion of the district. (Gov't. Ex. F–3, pp. 23–5.) The residents of the District were informed that this school would be attended by the "overflow" from Roosevelt and Coolidge Schools and that it would, therefore, serve Negro and white students. (Gov't. Ex. F–3, p. 2; O–2; pp. 4–5 (Graf).)

There was considerable opposition to this proposed location among residents in the southwest part of the District on grounds that it would be integrated. (Gov't. Ex. F.–3, pp. 14, 16, 18–19; O–2, pp. 7–9, 11–12 (Graf); O–4, pp. 11–15 (Weier).) The proposal was defeated in the referendum. Gov't. Ex. F–3, pp. 31–2. In April 1964, after four new board members had been elected (Gov't. Ex. O–2, pp. 14–15 (Graf), the majority of Board members believed that the sentiment of the district opposed desegregated schools and the Board accordingly proposed the construction of two schools, one in the far southwest part of the district and the other as an addition to the existing all-Negro Coolidge School. (Tr. 515–6 (Bogolub); Tr. 785–6 (Watts);

Tr. 386 (Watkins); Gov't. Ex. O–2, pp. 14–19, 23–26 (Graf); O–4, pp. 22–23, 43–51 (Weier); O–5, pp. 15–17 (Weier).) Gov't. Ex. F–4, p. 30.) At this time, a majority of the Board members believed that the voters of District 151 would not approve a referendum for facilities which would, because of their location, result in integration of students. (Tr. 515–6 (Bogolub); Tr. 785–6 (Watts); Tr. 386 (Watkins); Gov't. Ex. O–2, pp. 14–19, 23–26 (Graf); O–4, pp. 22–23, 43–51 (Weier); O–5, pp. 15–17 (Weier).) At a referendum held on December 5, 1964, the proposal containing these specific locations passed. The schools which were constructed pursuant to this authorization were the Kennedy and Taft Schools. (Tr. 508, 517 (Bogolub).) A substantial factor in the defeat of the proposal voted upon in February 1964 and the adoption of the proposal voted upon in December 1964 was that the former would have authorized the construction of a school serving both Negro and white students while the latter established one school which would serve Negro students and a second whose enrollment would be all-white.

21. Prior to the referendum of December, 1964, during the period in which the Board of Education was considering possible locations for the construction of new facilities, Mr. L. K. Watkins, a Negro Board member, suggested utilization of a site in South Holland, north of 153rd Street (also called 157th Street) and east of 9th Avenue. A school in this location would probably have been integrated because of residential patterns in the area. The opinion of a majority of the Board members, that the voters would not support a referendum for a school which would be integrated, was a substantial factor in the decision not to accept the site proposed by Mr. Watkins. (Tr. 377–86 (Watkins); Tr. 510–515 (Bogolub); Gov't. Ex. O–2, pp. 24–5 (Graf); T–1, T–2 and T–3; F–4, p. 29; O–4, pp. 25–6 (Weier); see paragraph 4 above.)

22. The sites for the Taft and Kennedy Schools were selected so as to pro-

mote and preserve the racial segregation of students in School District 151. The construction of these schools had this effect.

23. During the period beginning in the 1920's and continuing until at least the 1940's, some white children living in District 151 in South Holland on 153rd Street (also known as 157th Street) between State Street (also known as Indiana Avenue) and 9th Avenue, attended the Phoenix School and, after its opening, the Coolidge School. (Tr. 457–458 (Watkins); Tr. 720–7 (Tromp); Gov't. Ex. A–22; B–1 (children of Peter and Anna DeYoung); B–2 (children of Harry Ravesloot); B–3 (children of Richard and Cora Eylander).) As the enrollment of the Coolidge School became progressively more Negro in character, children from this area were permitted to attend the Roosevelt School. (See paragraph 6 above; Gov't. Ex. E–2 through E–9.) The enrollment of the Roosevelt School was all-white. (See paragraph 5 above.) This area is located closer to the Coolidge School than to the Roosevelt School. (Gov't. Ex. P–3, P–4, T–1. T–2. T–3.)

    (a) In the period between the 1920's and 1945, children of Peter and Anna DeYoung who resided on 153rd Street, as specified above, attended the Coolidge School. (Tr. 721, 725 (Tromp); Gov't. Ex. A–22, pp. 30–1, 32–3, 88–9, 113–4, 115–6; B–1.

    (b) In the period between the 1930's and 1947, children of Harry and Anna Ravesloot who resided on 153rd Street, as specified above, attended the Coolidge School. (Tr. 721, 6. (Tromp); Gov't. Ex. A–22, pp. 34–5, 36–7, 84–5, 98–9, 115–6, 117–8, 127–8; B–2.)

    (c) In the period between the 1930's and 1947, children of Richard and Cora Eylander, who resided on 153rd Street, as specified above, attended the Coolidge School. (Tr. 723, 6 (Tromp); Gov't. Ex. A–22, pp. 30–1, 36–7, 76–7, 92–3, 117–8; B–3).

24. In the period between the 1930's and 1947 children of Joe and Christiana Tromp, whose residence was located in South Holland on the north side of 151st Street, at the northern terminus of 9th Avenue, attended the Coolidge School (Tr. 718–9, 727 (Tromp); Gov't. Ex. A–22, pp. 13–14, 88–9, 92–3, 100–1, 102–3, 109–10; B–4).

25. The home of Jasper Tromp, a former member of the Board of Education of School District 151, is located in South Holland, a short distance east of the corner of 151st Street and 9th Avenue. Diane and Joe Tromp, children of Jasper Tromp, attended the Coolidge School until January 4, 1956 and September 4, 1956, respectively, at which time they transferred to the Roosevelt School. The Tromp residence was located within walking distance of the Coolidge School. Diane and Joe Tromp were bussed to the Roosevelt School. Jasper Tromp was a member of the Board of Education of District 151 at the time of his children's transfer. The Tromp children were white. (Tr. 202–6, 258, 281 (Kingsland); Tr. 727, 728–31 (Tromp); Gov't. Ex. P–3, P–4; Gov't. Ex. Q–6; Tr. 706–8 (Toler).)

26. During the 1956–57 school year, Mrs. Iola Toler, a Negro resident of Phoenix, and several other Negro residents of Phoenix attempted to enroll children at the Roosevelt School in South Holland. They were not permitted to register the children (Tr. 702–705 (Toler).

27. There was no written statement of the attendance zone boundaries for District 151 schools, prior to a Resolution adopted on October 5, 1964. The boundaries were again placed in written form on September 9, 1966, at the time of the opening of the Taft School. The boundaries adopted at those times included in the attendance zone for the Coolidge and Kennedy Schools all of the Village of Phoenix, but no other area of the District in which residences are located (Tr. 205–6, 219–221 (Kingsland); Tr. 405 (Watkins); Gov't. Ex. O–2, pp. 53–4

(Graf); F-4, pp. 27-8; Gov't. Ex. F-6, pp. 27-8).

28. The resolutions setting attendance zone boundaries of October 5, 1964, and September 6, 1966, placed in the attendance zone for the Roosevelt School the area referred to in paragraphs 23 and 24 and 25 above, which is located closer to the Coolidge than to the Roosevelt School. (Gov't. Ex. F-4, pp. 27-28; F-6, pp. 27-28; P-3, P-4, T-1, T-2, and T-3). Also placed in the attendance zone for the Roosevelt School was other territory east of Phoenix, located closer to the Coolidge School than the Roosevelt School, which is referred to in paragraph 16 above, concerning school bus transportation. (Gov't. Ex. F-4, pp. 27-8; F-6, pp. 27-8). Only white children reside in each of these areas. At the time of the adoption of each resolution, the enrollment of the Roosevelt School was all white and that of the Coolidge School and (after its construction) the Kennedy School, almost entirely Negro (See (5) and (6) above).

29. Beginning in about 1956 and continuing through and including the 1967-68 school year, under the attendance zone boundaries in effect in District 151, some white children living in the area immediately east of Phoenix, within walking distance of the Coolidge and Kennedy Schools, were bussed to the Roosevelt School. These children included the three children of Jasper Tromp who attended school at various times during the period specified and children living on 153rd Street (also known as 157th Street) in South Holland between State Street (also known as Indiana Avenue) and Ninth Avenue. (Gov't. Ex. Q-6; Tr. 204-212 (Kingsland); Tr. 723, 727 (Tromp); Ex. E-5, pp. 5, 12, 15, 16; E-6, pp. 6, 13, 16, 18; E-7, pp. 5, 16, 18; E-8, pp. 3, 6, 7; E-9, pp. 5, 6, 7, 9, 10, 12, 14, 15, 17, 20, 21; T-1; T-2; and T-3.

30. In February, 1967, a team of five educators recommended institution of an upper grade center for the District and proposed use of an existing facility for that purpose. (Tr. 755). All members of the Board agreed on the desirability of an upper grade center from an educational point of view. (Tr. 780-781). In early 1968, the Board considered four proposals for reorganizing the structure of District 151. Plan A would retain the status quo. (Tr. 1114). Plan B would establish an upper grade center at Roosevelt which would absorb all eighth grade students and some seventh graders. (Tr. 759 and Gov't. Ex. L-3). The plan which was educationally the most sound and was favored by the Superintendent (Tr. 768-771) was Plan C, which would use Coolidge School as an upper grade center for all seventh and eighth grade students in the District and would result in placing pupils presently attending Coolidge in grades 3 through 6 in the other five schools in the District, so that they would represent between 12 and 31 percent of student enrollment at each of those other schools. (Tr. 760, 768, 775, 972, 981.) The Board, reflecting community sentiment hostile to the desegregation which would result from Plan C (Tr. 536, 785, 798-800), rejected this proposal. Plan D, which was first adopted on February 5, 1968, and abandoned on February 19, involved only some shifting of students to avoid overcrowding at Eisenhower School. (Tr. 761).

31. The purpose and effect of the student assignment and structural reorganization policies and practices stated in paragraphs 20 through 30 was to segregate the students of District 151 on the basis of race and color.

32. As a result of the actions of the defendants specified in paragraphs 15 through 30, public school students in District 151 have been segregated on account of race. As a result of these actions, the Coolidge and Kennedy Schools have been established and are identifiable as "Negro" schools, because of the racial composition of their student bodies, and the Roosevelt, Madison, Eisenhower and Taft Schools have, because of the racial composition of their student bodies, become established and identifiable as "white" schools.

33. The defendants and their predecessors have engaged in racial discrim-

ination in the operation of School District 151 of Cook County, Illinois.

34. The defendants have failed to take affirmative steps to overcome the effects of past racial discrimination in the operation of School District 151 of Cook County, Illinois. (Gov't. Ex. J–1, pp. 2–3; M–1; Tr. 965–68, 969–971 (Watts)).

35. Failure to order desegregation of the faculty and to revise student assignment policies in District 151 at this time will result in the continuation of existing practices to the irreparable injury of Negro and white students residing in the District and will irreparably harm the interest of the United States in securing equal protection of the laws through the orderly desegregation of public education.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter of this action under Section 407 of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, and under 28 U.S.C. § 1345.

■ 2. The requirements of the Fourteenth Amendment to the United States Constitution and Title IV of the Civil Rights Act of 1964 apply equally to all public school systems without regard to whether State or local law authorizes racial discrimination. Taylor v. Board of Education of City School Dist. of City of New Rochelle, 191 F.Supp. 181, 182–183 (S.D.N.Y.1961), affirmed, 294 F.2d 36 (C.A. 2, 1961) cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961); Clemons v. Board of Education of Hillsboro, Ohio, 228 F.2d 853, 859 (C.A. 6, 1956).

■ 3. Pursuant to the Fourteenth Amendment and Title IV of the Civil Rights Act of 1964 this Court has jurisdiction to hear and decide all issues concerning alleged racial discrimination in public education in School District 151, including policies with respect to the assignment of students, the allocation of faculty and staff, the location and construction of schools, the transportation of pupils and the educational structure.

United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5, 1966), affirmed en banc, 380 F.2d 385 (C.A. 5, 1967), cert. denied Board of Education of City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed. 2d 104 (1967); Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala., 1967), affirmed Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

■ 4. Recruitment and assignment of public school teachers on a racial basis so as to establish schools that are racially identifiable by the composition of their faculties deprives students of the right to be free of racial discrimination in the operation of the public schools in violation of the Fourteenth Amendment. Rogers v. Paul, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Board of City of Richmond, Va., 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965).

■ 5. The contemporaneous existence, within one system, of some schools whose faculties and student bodies are almost exclusively white and other schools whose faculties and student bodies are almost exclusively Negro creates a presumption of discriminatory faculty assignments which requires the school authorities to demonstrate the constitutionality of their procedures. Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (C.A. 4, 1966); State of Alabama v. United States, 5 Cir., 304 F.2d 583, 586 (1962).

■ 6. The policy and practice of the defendants and their predecessors of assigning Negro and white faculty members, on the basis of race, to schools attended predominantly by students of the same race violates the Fourteenth Amendment. Kelley v. Altheimer Arkansas Public School District No. 22, 378 F.2d 483, 498–499 (C.A. 8, 1967).

■ 7. Defendants are under a constitutional obligation forthwith to take affirmative remedial action to desegregate racially the faculties and staff of schools in District 151. Dowell v. School

Board of Oklahoma City Public Schools, 244 F.Supp. 971 (W.D.Okla., 1965), affirmed, 375 F.2d 158 (C.A. 10, 1967), cert. denied, 387 U.S. 931, 87 S.Ct. 2054, 18 L.Ed.2d 993 (1967); Clark v. Board of Education of Little Rock School District, 369 F.2d 661 (C.A. 8, 1961).

8. Defendants are constitutionally obliged to allocate members of the faculty and staff so that no school is racially identifiable. That objective will be achieved when the racial composition of the faculty and staff at each school reflect proportionately the racial composition of the entire faculty and staff. Dowell v. School Board, supra; Coppedge v. Franklin County Board of Education, 273 F.Supp. 289, 300–301 (E.D.N.C. 1967), affirmed, 394 F.2d 410 (C.A. 4, decided April 8, 1968).

■ 9. The responsibility for faculty and staff desegregation is that of the defendants, not the teachers, and the achievement of the constitutionally required objective may not be made contingent upon the willingness of teachers voluntarily to transfer from their present schools. If necessary, teachers shall be assigned or reassigned to schools in order to comply with the constitutional requirement. United States v. Board of Education of City of Bessemer, 396 F.2d 44, C.A. 5; Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690 (C.A. 5, decided March 12, 1968, Slip Op., p. 12); Kier v. School Board of Augusta County, Virginia, 249 F.Supp. 239 (W.D.Va.1966).

■ 10. The total absence of Negro pupils from student bodies in regular classes at the Roosevelt, Madison, Taft and Eisenhower schools and the existence of almost exclusively Negro student bodies in regular classes at the Coolidge and Kennedy schools gives rise to a presumption of unconstitutionality in the establishment of student attendance zone boundaries, and requires the defendants to show constitutionally permissible bases for the attendance zones. Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 664 (C.A. 6, 1964); Evans

v. Buchanan, 207 F.Supp. 820 (D.Del., 1962).

■ 11. The intended and inevitable effect of the series of policy decisions by the defendants and their predecessors, made with respect to attendance zones, transportation of pupils, school site selection and construction, and organization of the structure of the educational program, as described in the foregoing findings of fact, has been to preserve racial segregation of students in violation of the Fourteenth Amendment. Brown v. Board of Education of Topeka, Shawnee County, Kansas, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Taylor v. Board of Education of City School Dist. of City of New Rochelle, 294 F.2d 36 (C.A. 2, 1961), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).

■ 12. A school board may not, consistently with the Fourteenth Amendment, maintain segregated schools or permit educational choices to be influenced by a policy of racial segregation in order to accommodate community sentiment or the wishes of a majority of voters. Cooper v. Aaron, 358 U.S. 1, 13, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958); Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 736–737, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Hall v. St. Helena Parish School Board, 197 F.Supp. 649, 659 (E.D.La. 1961), affirmed, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521 (1961); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

■ 13. A school board may not, consistently with the Fourteenth Amendment, purposefully tailor the components of a neighborhood school attendance policy so as to conform to the racial compositions of the neighborhoods in its school district; nor may it build upon private residential discriminations, Taylor v. Board of Education, supra; Brewer v. Norfolk School Board, 397 F.2d 37, C.A. 4.

14. The defendants' present constitutional obligation is to take all appropriate affirmative steps to correct the

effects of their racially discriminatory policies and practices with respect to allocation of faculty and staff and assignment of students. Green v. School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; United States v. Jefferson County Board of Education, 372 F.2d 836 (C.A. 5, 1966), affirmed en banc, 380 F.2d 385 (C.A. 5, 1967).

15. In order to remedy the effects of past discrimination, the Constitution requires the defendants to give affirmative consideration to racial factors in allocating faculty and staff members, assigning students, and with respect to decisions on other pertinent matters of educational policy, including the location and construction of schools, transportation of pupils, and the educational structure of the District. Dowell v. Board of Education, supra; Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (C.A. 1, 1965); Offerman v. Nitkowski, 378 F.2d 22 (C.A. 2, 1967); Wanner v. Arlington County School Board, 357 F.2d 452, 454 (C.A. 4, 1966); Brooks v. Beto, 366 F.2d 1 (C.A. 5, 1966); United States v. Board of Public Instruction of Polk County, 395 F.2d 66, 5 Cir.

16. The foregoing requirement does not conflict with Illinois law; if it did, however, State law would yield to the requirement of the Constitution. Tometz v. Board of Education of Waukegan, Ill., 237 N.E.2d 498; United States Constitution, Article VI, cl. 2.

17. That provision of 42 U.S.C. § 2000c–6 which withholds from the courts the power to require transportation of pupils to overcome racial imbalance in public schools must be construed to relate to so-called de facto or adventitious segregation. It is inapplicable where, as here, the existing segregation of pupils and teachers is inseparable from the practices and policies of the defendants. United States v. Jefferson County Board of Education, supra, 372 F.2d 878–886.

18. The representations of the defendants with respect to the progress presently being made toward faculty desegregation do not, on the facts found here, warrant withholding injunctive relief. United States v. W. T. Grant Co., 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

19. In view of the lapse of time since the decision and mandate of the United States Supreme Court in Brown v. Board of Education, supra, and in order to enable the defendants to undertake compliance with the requirements of the order issued herewith as far in advance of the beginning of the 1968–69 school year as possible, the issuance of a preliminary injunction is appropriate and necessary. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 229, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Porter v. Warner Holding Co., 328 U.S. 395, 397–398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

20. The Clerk is hereby directed that the mandate of this Court shall issue forthwith. A stay of the Order herewith shall not be available from this Court. This Court retains jurisdiction of this action for all purposes. Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727.

## ORDER

This action having come on for hearing upon motion of the United States for a preliminary injunction, and the Court having heard oral testimony presented by the parties on June 19–21, 24–28, and July 1–2, 1968, and having considered documentary evidence and depositions submitted by the parties in lieu of affidavits, and the Court being of the opinion that the relief sought should be granted, it is hereby:

Ordered, adjudged and decreed, that the defendants, their agents, officers, employees and successors and all those in active concert and participation with them, be and they are preliminarily enjoined from discriminating on the basis of race or color in the operation of

School District 151 and in the assignment of teachers or students to schools in that district. As set out more particularly in the body of this decree, the defendants shall take affirmative action to disestablish school segregation and eliminate the effects of prior unlawful conduct in the operation of the school system:

## I. FACULTY DESEGREGATION

1. To correct the effects of past segregated assignment of faculties, the defendants shall forthwith begin filling vacancies and assigning teachers to positions in schools where their race is in the minority. The defendants shall establish as an objective, to be fully accomplished by the commencement of the 1969–1970 school year, that the pattern of teacher assignment to any particular school not be identified as tailored for a heavy concentration of either Negro or white pupils in the school.

2. For the commencement of the 1968–1969 school year, the defendants shall achieve not less than 50% of this ultimate objective, measured by the number of minority-race teachers in each school.

3. The interim and ultimate objectives referred to above may, where possible, be achieved by new hiring and voluntary transfers. If these measures do not produce adequate numbers of teachers to satisfy the interim and ultimate objectives, defendants shall reassign the additional teachers needed to comply with these requirements.

4. The above steps shall be taken, notwithstanding that teacher contracts for 1968–1969 or 1969–1970 may already have been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with the above provisions.

5. Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring on the ground of race or color.

## II. STUDENT DESEGREGATION

1. The defendants shall promptly take steps to disestablish the Coolidge School as a predominantly Negro school in time for the commencement of the 1968–1969 school year.

2. The above objective may be accomplished by the implementation of the proposal submitted by the superintendent to the Board of Education in January and February 1968 as "Plan 'C'" or by any method which would similarly have the effect of disestablishing the Coolidge School as a predominantly Negro school.

3. Defendants shall submit to the Court, and serve upon the parties, not later than July 15, 1968, the details of a plan designed to achieve the objective specified in the above paragraphs.

4. The defendants shall formulate a School as a predominantly Negro school. plan for the disestablishment of the Kennedy School as a predominantly Negro school in time for the commencement of the 1969–1970 school year.

5. The objective of the plan required by paragraph 4 shall be to redraw school attendance zones or reorganize attendance patterns so as to disestablish the Kennedy School as a predominantly Negro school.

6. Defendants shall submit to the Court, and serve upon the parties, not later than October 15, 1968, the details of the plan required by paragraph 4.

7. For the 1968–1969 school year, students at the Kennedy School shall have the right to apply for transfer and be enrolled in any school in the district where, at their grade level, there are 33 or less students per class.

## III. NEW CONSTRUCTION

1. The defendants, to the extent consistent with the proper operation of the school system as a whole, shall locate any new school and substantially expand any existing schools with the objective of eradicating the effects of past segregation.

2. The defendants shall not take any action with respect to the construction of new school facilities or the substantial expansion of existing schools without leave of this Court, after notice has been

served on the parties, until the formulation and submission of the plans required by Section II of this decree.

## IV. REPORTS

1. The defendants shall serve upon the plaintiff and file with the Clerk of the Court, on or before fifteen days after the opening day of the 1968–1969 school year a report tabulating by race the number of students in each school in the district. The report shall also list, by name and address, each student who applied for transfer from the Kennedy School to other schools in the district, the grade of the student, whether the application was granted, and, if not, the reason for the denial.

2. The report shall also list the teachers at each school, the grade or grades they have been assigned to teach, and their race. It shall also list the vacancies filled by the hiring of teachers from outside the system at each of the schools.

## V. JURISDICTION

The Court hereby retains jurisdiction over this case to assure full compliance with this decree.