**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**SCHOOL DISTRICT 151 OF COOK
COUNTY, ILLINOIS, et al.,
Defendants-Appellants.**

**No. 17022.**

United States Court of Appeals
Seventh Circuit.

Dec. 17, 1968.

Rehearing Denied Jan. 27, 1969.

Louis Ancel, Marvin J. Glink, Ronald M. Glink, Chicago, Ill.; John M. Van Der Aa, South Holland, Ill., N. E. Hutson, Legal Advisor, Springfield, Ill., for Ray Page, amicus curiae, Superintendent of Public Instruction, State of Illinois, for appellant.

Thomas A. Foran, U. S. Atty., Chicago, Ill.; Nathan Lewin, U. S. Department of Justice, Washington, D. C., Jack B. Schmetterer, Asst. U. S. Atty., Stephen J. Pollak, Asst. Atty. Gen., J. Harold Flannery, Robert Pressman, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before DUFFY, Senior Circuit Judge, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

This is an appeal by defendants from a preliminary injunction order in a civil rights action brought by the United States Attorney General under 42 U.S.C. § 2000c–6(a) to desegregate grammar schools in Illinois School District 151. We affirm the preliminary injunctive order for the government, and remand for further proceedings upon the government's motion for permanent injunction.

The District embraces parts of the cities of Phoenix, South Holland and Harvey—all in Thornton Township, Cook County, Illinois. Six schools are operated in the District: Madison, Taft, Coolidge, Roosevelt, Eisenhower and Kennedy. Madison, Taft, Roosevelt and Eisenhower accommodate children from kindergarten through eighth grade. Coolidge serves children in third through eighth grades, and Kennedy, immediately adjacent to Coolidge, serves kindergarten through second grade.

Before the Roosevelt School was built in 1934, the only school in the District —then a sparsely populated farming

area—was the Phoenix School, with a student body 95% White and 5% Negro. The Coolidge School was built in 1936, two years after the Roosevelt School, to replace the old Phoenix School. Constantly increasing population in the District required additions to Roosevelt and Coolidge and construction of four new schools, Madison in 1957, Eisenhower in 1960, and Taft and Kennedy, both in 1966. The Coolidge and Kennedy Schools are adjacent and are located in the northwest part of the District in the city of Phoenix; Taft is southwest of Phoenix in the city of Harvey; Roosevelt, Madison and Eisenhower are located in South Holland, in the area east of Phoenix.

While the population increases were uniform throughout the District, the increase of the Negro population in Phoenix changed the racial makeup of the Coolidge School so that in 1948 the enrollment was 30% Negro and 70% White. Since the school year 1956–57, the enrollment at Coolidge, and since 1966 at Coolidge and Kennedy combined, has been about 99% Negro. Since no Negroes presently reside or have ever resided in the Harvey or South Holland area outside of Phoenix, the population of the area of the four schools, in that area, is "almost exclusively" White.[1]

Before this suit was filed, charges were made to the Illinois Superintendent of Public Instruction and the United States Department of Health, Education and Welfare, that the School District was deliberately pursuing the policy of segregating Negro pupils and teachers from White schools on the sole basis that they were Negroes. The Superintendent and the Department both found that the evidence did not support the charges. This suit followed, seeking preliminary and permanent injunctions

against racial segregation of pupils in the School District. After a lengthy hearing, the district court found substantially that "defendants and their predecessors" had failed to take steps to overcome the effects of past racial discrimination and had engaged in purposeful segregation policies and practices so as to segregate pupils on the basis of "race and color."[2]

The district court made detailed findings of fact which are for the most part unchallenged here. As ultimate facts the court found substantially that before 1964 defendants' predecessors had segregated Negro from White pupils on the sole basis of their being Negro; and that since 1964 defendants had by their policies and practices not only failed to overcome the unconstitutional discrimination of their predecessors, but had themselves, by their own policies and practices, continued to maintain unconstitutional segregation in the School District through decisions based solely on the fact that Negro pupils were Negro. The court found that these decisions consisted of formal drawing of attendance zones, bussing of pupils, assignment of teachers, location and construction of schools, and rejection of a plan for restructuring the School District. It concluded that this conduct of defendants and their predecessors violated the equal protection clause of the Fourteenth Amendment of the United States Constitution.

On July 8, 1968, the court concluded that the issuance of a preliminary injunction was appropriate and necessary because of the long time since the mandate of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown, I*), and to give defendants sufficient time before the beginning of the 1968–69 school year to un-

---

1. The defendant, Board of Education, in the last several years has conducted racially integrated educable mentally handicapped and trainable mentally handicapped District-wide programs, and also integrated District-wide summer schools.

2. This term is somewhat ambiguous since, although no Negro pupils were regularly enrolled in any school in the area, outside of Phoenix, there is testimony that some Japanese children attended schools in that area.

dertake compliance with the injunctive order.

That order directed the disestablishment of the Coolidge School as a "predominantly Negro" school by adoption of "Plan C [3] or by any other [similar] method": to formulate a plan for disestablishment of the Kennedy School as a "predominantly Negro" school for the 1969–70 school year; to redraw school attendance zones for the Kennedy School; and to provide pupils of the Kennedy School for 1968–69 the right to apply for transfer to any school in the District at their grade where classes have fewer than thirty-four pupils. The order further directed defendants to begin filling teacher vacancies by assigning new teachers to positions in schools where "their race is in the minority," with the objective of eliminating, for the 1969–70 school year, identification of schools by teacher placement as either Negro or White. The defendants were further ordered to achieve 50% of this ultimate objective for the 1968–69 school year. If voluntary transfers or new hiring would not attain either the ultimate or the intermediate objective, the defendants were ordered to reassign presently employed teachers to reach the objective even though their contracts may have been executed for the 1968–69 or the 1969–70 school year. Defendants, under the order, were not to take action for construction of new facilities, or additions to existing facilities, without leave of court to insure that future construction will be guided by the objective of eradicating the effects of past segregation. The order directed defendants to submit to the court detailed plans for the disestablishment of the Coolidge and Kennedy Schools as "predominantly Negro" schools, not later than July 15 and October 15, 1968 respectively. The appeal before us is from that order.

## THE HEARING

The first contention of defendants is that they were denied a fair hearing because the court refused them adequate time to prepare their defense to the government's motion for preliminary injunction. There is no merit in this contention.

■ The Attorney General filed suit on April 25, 1968, and applied for the injunctive relief on May 27, 1968. Defendants answered on June 3, 1968. On June 13 the Attorney General moved for a preliminary injunction, and the court set a hearing for June 19, 1968. On June 17 defendants moved for sixty days' continuance. The motion was denied and the hearing proceeded from June 19 through July 2, 1968.

■ It is true that "voluminous" answers to defendants' interrogatories of June 3 were not filed until June 15. Nevertheless we see no abuse of discretion in denying the continuance. Defendants have not given us any good reason why they could not, after June 15 and until the hearing closed July 2, have prepared for their defense, nor have they shown what matter, specifically, was not offered that would have been had more time been available Neither is there any showing that defendants requested delay, at any time before or after the hearing began, for less than sixty days. And a sixty days' continuance would have brought the hearing date to the middle of August, just a few weeks before commencement of the school year.[4]

3. Plan C is a plan which had been proposed by Superintendent Watts of School District 151 to restructure the School District. It called for an upper grade center at Coolidge for all the seventh and eighth grade pupils of the District. The pupils previously attending Coolidge would, under the plan, be distributed throughout the remaining District schools. Plan C was rejected by the School Board. See text, infra.

4. The validity of the injunction before us is not defective because the court did not consolidate hearing of the motion for permanent injunction with that for the preliminary injunction. The court was not required to use its power under Rule 65(a) (2), Fed.R.Civ.P. (1966) to consolidate the motions for hearing. Neither was the court required, on this record, to deny preliminary relief because the preliminary injunction virtual-

## THE MERITS

Defendants next contend that they have no constitutional duty to bus pupils, in the District, to achieve a racial balance. It is true that 42 U.S.C. § 2000c–6 withholds power from officials and courts of the United States to order transportation of pupils from one school to another for the purpose of achieving racial balance. However, this question is not before us. Although we recognize that past residential segregation itself, in the District, severely unbalanced racially the school population, the district court's judgment is directed at the unlawful segregation of Negro pupils from their White counterparts which is a direct result of the Board's discriminatory action. Therefore, the district court's order is directed at eliminating the school segregation that it found to be unconstitutional, by means of a plan which to some extent will distribute pupils throughout the District, presumably by bus. This is not done to achieve racial balance, although that may be a result, but to counteract the legacy left by the Board's history of discrimination.

 The Constitution forbids the enforcement by the Illinois School District[5] of segregation of Negroes from Whites merely because they are Negroes. The congressional withholding of the power of courts in Section 2000c–6 cannot be interpreted to frustrate the constitutional prohibition. The order here does not direct that a mere imbalance of Negro and White pupils be corrected. It is based on findings of unconstitutional, purposeful segregation of Negroes, and it directs defendants to adopt a plan to eliminate segregation and refrain from the unlawful conduct that produced it.

Defendants next contend, on authority of this court's decision in Bell v. School City of Gary, 324 F.2d 209 (7th Cir. 1963), cert. denied, 377 U.S. 924, 84 S. Ct. 1223, 12 L.Ed.2d 216 (1964), that the district court's judgment is erroneous.

They argue that in the case before us a normal migration of Negroes into Phoenix produced a corresponding racial pattern of de facto segregation of Negro pupils in Coolidge and Kennedy Schools, and White pupils in the other four schools, and that there is no constitutional violation in the Board's "inaction" in the face of racial imbalance.

The *Bell* case, written by Judge Duffy, is a leading case on the question of neighborhood schools. The *Bell* neighborhood school doctrine, however, does not control our decision here. That doctrine, followed in Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), and Downs v. Board of Education, 336 F.2d 988 (10th Cir. 1964), cert. denied, 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965), presupposes an "innocently arrived at" de facto segregation with "no intention or purpose" to segregate Negro pupils from White.[6] The court in *Bell* was speaking upon the facts in that case where the Negro plaintiffs' position was that they had a "right to be integrated in school" and that this right was a purpose which overrode considerations of safety and convenience of pupils and the costs of the operation of the school system. The district court in *Bell* had considered the safety, convenience and cost factors. It had found too that the attendance zone boundaries were determined without any consideration of race or color, and found, with this

ly determined the ultimate issue. Selchow & Righter Co. v. Western Printing & Lith. Co., 112 F.2d 430 (7th Cir. 1940).

5. No point is made that the School District's conduct was not state action.

6. This court stated in *Bell*: "We agree with the argument of the defendants

stated as 'there is no affirmative U. S. constitutional duty to change innocently arrived at school attendance districts by the mere fact that shifts in population either increase or decrease the percentage of either Negro or white pupils.' " 324 F.2d at 213.

court's approval, that the boundaries had been "reasonably arrived at and that the lines have not been drawn for the purpose of including or excluding children of certain races." In the course of its opinion this court said that plaintiffs had no authority for the claim that the defendants in *Bell* had an affirmative duty to redraw boundary lines "for the purpose of mixing or blending Negroes and whites in a particular school."

The nub of defendants' argument is that the de facto segregation pattern in Phoenix and the other cities within the School District came about innocently, and that under the *Bell* decision they have no constitutional duty to undo the innocent result. The weakness in this argument is that the district court did not find that defendants inherited an innocent de facto segregation situation, but found that they inherited from their predecessors a discriminatorily segregated school system which defendants subsequently fortified by affirmative and purposeful policies and practices which effectually rendered de jure the formerly extant de facto segregation. The court found invidiousness in these policies and decisions, in an unlawful discrimination by defendants and their predecessors both before and after February, 1964. We need not, therefore, consider defendants' argument that they had no duty to desegregate a purely de facto segregated school district. Offerman v. Nitkowski, 378 F.2d 22 (2d Cir. 1967). This is not a case of mere "inaction" under the court's finding of the unlawful actions of the Board.

But, defendants finally argue, the findings of purposeful, invidious, unconstitutional segregation are clearly erroneous as unsupported by substantial evidence in the record. We see no merit in this argument.

There is evidence that White pupils living in the area east and northeast of Phoenix attended Coolidge School from the 1920's to 1956 during the population shift from White to Negro. No later than 1956, White children living in this area, who were closer to Coolidge than to Roosevelt, were permitted to transfer and were bussed to Roosevelt. In 1956 Negro parents were denied permission to enroll their children in Roosevelt. It is not clear whether there were definitive attendance zones for Coolidge or Roosevelt at the time. If there were not, the Negro pupils were denied the freedom of choice between Coolidge and Roosevelt; if there were, it would seem that the boundary was observed only against Negro children. It was not until 1964 that attendance zone boundaries were first formalized for the District. They were modified, slightly, in 1966. On both occasions the zone for Coolidge, and in 1966 for Kennedy and Coolidge, included all of Phoenix but no other residential part of the District. The formal attendance zone for Roosevelt included the area adjoining Phoenix on the east, from which White children living closer to Coolidge than to Roosevelt had, up to 1956, gone to Coolidge.

In addition to this objective evidence, there was testimony that in 1966 two of a three member committee to study attendance zone boundaries asked the Board president for appointment to the committee to make sure the boundaries "were not changed any more than they had to be"; and all members of the Committee told the president they wanted to keep Coolidge Negro. A former Board president and the District Superintendent testified that the Board members had racial motivation in the drawing of the boundaries.

The government relies upon Taylor v. Board of Education, 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), to sustain the inferences as to the unconstitutional conduct of defendants with respect to the attendance zones. Defendants seek to distinguish *Taylor*, on the ground that the government here failed to prove that the Board caused, or contributed to causing, Coolidge to be a predominantly Negro school. It is true that there is a factual difference in *Taylor*. There the 1930 Board had "carved out" a White area from one school district close to a

school and put it in a district where the school was distant, and later replaced it when Negroes moved into the latter district. In the case before us the predominantly Negro Phoenix-Coolidge enrollment segregation was not originally created by the Board.

We see no difference, however, in principle between this case and *Taylor*. In *Taylor* the Board had changed from an earlier modified neighborhood school policy to a rigid neighborhood school policy in order to freeze a 94% Negro school. Here the Board's attendance zone policy was found to have purposefully frozen a Coolidge-Kennedy enrollment of 99% Negro children. In both cases, the Board was found to have drawn lines to effectuate and perpetuate a purposeful, discriminatory condition, and race was made the basis for school districting, with the purpose and result of segregating public schools.

Before 1964, pupils living in Harvey Highlands adjacent to Phoenix on the southwest, much closer to Coolidge than to Roosevelt, were bussed to Roosevelt. Some White children living within walking distance of Coolidge and Kennedy were bussed to Roosevelt. The court found that this bussing policy was not based on a safety factor. In the years when the White population of Phoenix was greater than Negro, there could be no invidiousness attributed to this practice. However, considering the years following 1956, after the population shift had made Negroes a majority in Phoenix, that bussing practice could well have induced the district court to view it as racially motivated, since the ·court considered this together with evidence that there were vacant classrooms at Coolidge, and that Negro children had been denied admission to the all-White Roosevelt School.

Moreover, there is ample evidence regarding purposeful faculty segregation aimed at keeping "Negro schools" Negro and "White schools" White. The first Negro teacher in the District was employed at Coolidge in 1953. The number of Negro teachers employed at Coolidge gradually increased thereafter, while the rest of the schools had all-White faculties. In 1964 two teachers, one a music teacher and the other a substitute teacher, were the first Negro teachers assigned to teach throughout the District. Not until 1966 was a Negro assigned as a regular teacher in the District area outside of Phoenix. A White teacher was not assigned to Coolidge until 1967, when the first White teacher there shared her time with Kennedy School. She was also the first White teacher at Kennedy. In 1966–67 there were fifty-seven White and thirty-five Negro teachers employed throughout the District, but sixteen Negroes were assigned to Coolidge, and fifteen assigned to Kennedy.

In assigning presently employed teachers to vacancies, there is a corresponding disproportion. There were four vacancies in 1953–54 in the District outside of Phoenix, and in 1965–66 there were twenty-two vacancies. Yet no Negro teacher was assigned to a vacancy. Negroes were assigned to fill four of thirty-five vacancies in 1966 and in 1967 Negroes were assigned to three of thirty-two vacancies. At Coolidge and Kennedy, Negro teachers were assigned to thirteen of thirteen vacancies in 1965–66, to eleven of eleven vacancies in the following year, and to nine of ten vacancies in 1967–68.

■ Defendants contend, on authority of Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966), that the district court's finding that racial segregation motivated defendants in selecting sites for the new Taft and Kennedy Schools presupposes that the Board was constitutionally required to locate its new schools so as to further the cause of integration. The holding in *Deal* is that a Board has no constitutional duty to select new school sites to further the "sole purpose of alleviating ra-· cial imbalance that it did not cause." 369 F.2d at 61. That holding, considered in the context of the *Deal* opinion,

is inapposite here, since we think the district court's finding was justified on the facts before us. We agree with the government that it does not follow from the absence of a duty to achieve racial balance that a Board may deliberately select sites to achieve racial segregation.

In February, 1964, the Board submitted a referendum to the District voters on construction of a school in Harvey Highlands to relieve crowded conditions at Coolidge and Roosevelt. The proposition lost. The majority of the Board attributed the loss to sentiment of voters against integration of Negro and White pupils. A referendum was submitted to the voters in December, 1964, for construction of a new school and an addition to Coolidge School. This referendum was approved by the voters, resulting in the construction of Taft, a "White" school and Kennedy, a "Negro" school, in Phoenix adjoining Coolidge. Fundamental rights may not be submitted to voters, nor be made dependent on elections. West Va. St. Bd. of Education v. Barnette, 319 U. S. 624, 638, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

We agree with defendants, however, that the district court's finding that voters were racially motivated in the February and December, 1964, elections was clearly erroneous as without a substantial evidentiary basis. The court did find, however, that the sites for the two new schools were selected by the Board to preserve racial segregation. We agree with this finding. There is evidence that the Board accepted the recommendations of various Board members and acquiesced in sentiment of District residents that new construction outside of Phoenix remain all White.

In early 1967 a team of five educators recommended that one upper grade center for seventh and eighth grade pupils be established for the entire District, and the Board members agreed generally with the recommendation. Later the new Superintendent, Watts, submitted several plans for the purpose: one, for example, would maintain the status quo, one would locate the center at Roosevelt, and Plan C, favored by Watts, would locate the center at Coolidge and distribute Coolidge pupils in third to sixth grades throughout the District.

The court found that the Board, "reflecting community sentiment hostile to the desegregation" which Plan C would effect, rejected the plan. In so finding, the court did not accept defendants' testimony excusing Board rejection of Plan C on grounds of financial inability to implement the plan because of unsalability of previously authorized but unissued bonds. It thought that the School District had sufficient resources available to implement Plan C. Defendants challenge the finding.

There is no merit in defendants' argument that no discrimination resulted from the Board's rejection of Plan C since White and Negro students were affected equally by the decision. The point is that rejection, in the district court's finding, was not innocent or based on cost, safety, convenience, or other rational basis, but merely because Negro pupils were Negro—a reflection of the resident hostility.[7] Testimony of a former Board president and of Superintendent Watts that in their view racial segregation was the basis of the Board's decision is also relevant here. The court could justifiably attribute rejection of Plan C, previously recommended by the Superintendent, to the same invidious racial segregation purpose it found present in the unconstitutional drawing of attendance zones, assignment of teachers and selection of sites for new schools.

We cannot say that on the facts recited above the ultimate fact findings on this record are clearly erroneous or that the district court's conclu-

7. There is no doubt that Board members were under severe pressure from District residents and that performance of duty was made difficult. But this cannot excuse the unconstitutional conduct justifiably found on this record.

sions based thereon are erroneous. It follows that we approve the court's conclusion that the conduct of the Board in assigning teachers on the basis of race, drawing attendance zones, bussing students, and in selecting school sites to preserve segregation was unconstitutional state action enforcing segregation of Negro from White pupils solely on the basis of their being Negro, and therefore violative of the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown, I*).

■■■ We reject defendants' argument that the government, having failed to prove unconstitutional conduct, resorted improperly to dependence upon psychological motivations of the Board. In the first place the government did not fail to adduce the necessary substantive proof, and in the second place dependence on motivation is not improper. In Griffin v. County School Board, 377 U.S. 218, 231, 84 S.Ct. 1226, 1233, 12 L.Ed.2d 256 (1964), the Court noted the objective arrangement of closing public schools and operating private schools with state and county financial aid was constructed for "one reason and one reason only," unconstitutional segregation. Invidious conduct is made so because of human psychology involved in the process of unconstitutional discrimination. As we have already pointed out, the unconstitutional purpose of the Board members is a prime distinction between this case and Bell v. School City of Gary, supra. See also Offerman v. Nitkowski, 378 F.2d 22 (2d Cir. 1967); Wanner v. County School Bd., 357 F.2d 452 (4th Cir. 1966).

### THE INJUNCTION

The district court, having concluded that the preliminary injunction was appropriate and necessary, entered the July 8 order covering, in general: I, Faculty Desegregation; II, Student Desegregation; III, New Construction; IV,

Reports. On July 16, 1968, defendants filed Defendants' Plan Pursuant to Preliminary Injunction Order. Plaintiffs responded with Objections to Plan. And on July 22, 1968, the court, without hearing testimony, but hearing arguments of counsel, entered its supplementary order sustaining the objections to defendants' alternate plans and entered a detailed order implementing to a considerable extent Plan C. The portions of Plan C incorporated in the order were the location of the upper grade center at Coolidge, the distribution of Coolidge pupils in grades third through sixth among Roosevelt, Madison, Eisenhower and Taft, with the Kennedy School to serve grades kindergarten through second, and adopting the attendance zones substantially as formalized in 1966. It is needless to discuss the order at greater length.

We need not pass upon the defendants' objections that the supplementary orders entered July 8 and July 22, 1968, directed "hasty" and "ill-considered" solutions. The July 8, 1968, and supplementary orders, are with respect to the preliminary injunction.[8] Still pending in the district court is the government's motion for a permanent injunction. Nor will good purpose be served now by criticism or approval of the preliminary injunctive directions which presumably have to some extent been followed by defendants under the compulsion of the orders of July 8 and July 22, 1968. What has been done has been done. The important issue now is on the prayer for permanent injunction and a resolution of the issue should be made in the district court at the earliest practical time so that an orderly, reasonable transformation of School District 151 be accomplished for the 1969–70 school year.

■■■ The hearing on the permanent injunction issue will be plenary. We merely suggest considerations of our own and of other courts that pertain to the decision on the issues. The Plan C

---

8. No appeal was taken from the July 22 order, but the district court certified

to this court the record of the proceedings, inter alia, relating to that order.

upper grade center at Coolidge was recommended by Superintendent Watts. The team of educators recommended that the center be located at Taft. Plan C has been implemented more or less as a preliminary step gathering relevant practical experience. At the hearing both sides may call, and the district court may hear, or call, experts with respect to either of these recommendations or alternatives. There should be evidence with respect to the factors of safety, convenience of pupils and parents, and costs to and resources of the School District. The ideal solution should be considered with these factors in mind and should be aimed at the goal of eliminating "root and branch" segregation of Negro children from White on the sole basis of being Negro. Green v. County School Bd., 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Considerations of racial factors in undoing unconstitutional segregation are permissible. Wanner v. County School Bd., 357 F.2d 452 (4th Cir. 1966).

 Defendants have the burden, in view of the district court's July 8, 1968, order, of presenting a plan which "promises meaningful and immediate progress toward disestablishing" the existing unconstitutional discrimination. Green v. County School Board, 391 U.S. at 439, 88 S.Ct. at 1695, Northcross v. Board of Education, 333 F.2d 661 (6th Cir. 1964).

In the *Brown, II* case, Brown v. Board of Education, 349 U.S. 294, at 300–301, 75 S.Ct. 753, at 756, 99 L.Ed. 1083 (1955), the Court said, that with respect to desegregating a school system, lower courts "may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems."

 There is no hard and fast rule that tells at what point desegregation of a segregated district or school occurs. The court in *Northcross* said the "minimal requirements for non-racial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right." 333 F.2d at 662. On the other hand, "The law does not require a maximum of racial mixing or striking a rational balance accurately reflecting the racial composition of the community or the school population." United States v. Jefferson County Board, 372 F.2d 836, 847, n. 5 (5th Cir. 1966) aff'd en banc, 380 F.2d 385 (5th Cir.), cert. denied, Cado Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L. Ed.2d 103 (1967). The district court's judgment here must be made upon a determination whether defendants—by what they have done since the beginning of the 1968–69 school year, under the July 8 and July 22, 1968, orders—have shown a good faith performance, and whether the plans they may submit hold promise of future good faith performance toward achieving a non-racially structured school system which is reasonably related to the objective of the court's order. A final caution should be added with respect to a "freedom of choice" plan, or a "free transfer plan." These have been held to be constitutionally unacceptable where there are other more effective means to achieve desegregation of a school system. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689 (1968), and Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968), respectively.

We affirm the determination of the district court that defendants and their predecessors are guilty of denying Negro children in District 151 equal protection of the law in violation of the Fourteenth Amendment by virtue of the defendants' invidiously discriminatory policies, decisions and practices based solely on the fact that the children are

Negroes. We further affirm the district court's preliminary injunction order and remand the cause to the district court for further proceeding upon the government's motion for permanent injunction.

DUFFY, Circuit Judge (dissenting).

I respectfully dissent. I do not believe this important case should have been tried and decided on a motion for a preliminary injunction. I have understood that it is the purpose of a preliminary injunction to maintain the status quo. Certainly, the opposite procedure was followed in the trial of this case.

It should be noted that prior to the filing of the instant suit, complaint had been made to the Superintendent of Public Instruction for the State of Illinois, containing charges of segregation of Negro teachers and pupils in School District 151, similar to those presented in the case at bar. After hearing evidence, the Superintendent of Public Instruction, May 26, 1966, rendered a decision in which he found "a consideration of all evidence does not show that any child or teacher is segregated in or excluded from a particular school solely by reason of their race as charged in the petition."

A similar complaint was made to the United States Department of Health, Education and Welfare. Three officers of that Agency investigated the conditions in School District 151, and on November 22, 1966, informed the School Board of that District they could see no pattern of wilful discrimination against pupils or teachers and that they would so report to their office in Washington and to the Department of Justice.

The Government filed its original complaint on April 25, 1968. This complaint sought only the desegregation of the faculty of School District 151. The amended complaint which was filed on May 27, 1968, sought desegregation of both faculty and students in School District 151. On June 14, 1968, the Government filed a motion for a preliminary injunction. Over the objection of

defendants, the motion was set for hearing only five days later. The defendants asked the Court to continue the hearing on the temporary injunction in order to give them sufficient opportunity to prepare their defense. This motion was denied, and trial was commenced on June 19, 1968. In my view, this rush act was not justified especially in view of the fact that it was the Government which, after a long investigation, delayed the filing of the amended complaint until May 27, 1968.

Throughout the hurried trial, the Government contended that the School Board of District 151, by a series of discriminatory decisions, resulted in the establishment of the Coolidge School as a "predominantly Negro" school. The Government's proposed findings and conclusions in this respect were accepted verbatim by the trial court. Apparently little, if any, consideration was given to the factor of residential or de facto segregation.

In 1948, the Coolidge School had an enrollment of 70% white. In 1956, Coolidge had become a predominantly Negro school with a student enrollment of 99% Negro. There is absolutely no evidence in this record that during this eight-year period, the School Board did anything to change the racial composition in the Coolidge School. The attendance boundaries for Coolidge in 1956 were identical with those which existed in 1948.

It seems obvious that the failure to change boundaries in 1964 could not and did not play any part in the Coolidge School becoming a 99% Negro school during the period from 1948 to 1956.

Bell v. School City of Gary, 7 Cir., 324 F.2d 209 (1963) established the law in this Circuit pertaining to so-called de facto segregation. In *Bell*, we held that no affirmative constitutional duty existed to change innocently arrived at school attendance districts by the mere fact that shifts in population had increased or decreased the percentage of Negro or white populations.

A petition for certiorari in the *Bell* case was denied. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216. Our opinion in *Bell* was followed by the Tenth Circuit in Downs v. Board of Education of Kansas City, 336 F.2d 988 (1965). A petition for certiorari in that case was denied. 380 U.S. 914, 85 S.Ct. 898, 13 L. Ed.2d 800. Our *Bell* decision was also followed by the Sixth Circuit in Deal v. Cincinnati Board of Education, 369 F.2d 55 (1966). Certiorari was again denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

When the Bill which later became the Civil Rights Act of 1964 was before the House of Representatives, it gave the Attorney General wide authority to file suits in any part of the country in order to force integration. The Senate, however, adopted an amendment which was included in the Bill and which became law, which provided "Nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance * * *."

In the discussion on the Senate Floor, Senator Byrd of West Virginia addressed Senator Humphrey who was in charge of the Bill asking: "Can the Senator from Minnesota assure the Senator from West Virginia that under Title VI, school children may not be bussed from one end of the community to another end of the community at the taxpayers' expense to relieve so-called racial imbalance in the school?" Senator Humphrey replied: "I do." He further stated that the provision "merely quotes the substance of a recent court decision which I have with me and which I desire to include in the Record today, the so-called *Gary* case." [1]

Thus, we have the situation where the principles announced in our *Gary* decision were brought before the Supreme Court on three separate occasions when request for certiorari was made, but in each instance, a review of our decision was denied. We also know that the attention of the United States Senate was specifically directed to our decision in that case.

The majority opinion does make mention of the *Bell* case but says it does not control our decision here. Yet, there are many important factors which are similar.

In 1950, the population of Gary was 133,911 which included 39,326 Negroes. In 1960, the population was 178,320 of which 69,340 were Negroes. In 1961–62, in certain areas of Gary, twelve schools had 99 to 100% Negro students. A very similar situation existed in the city of Phoenix in School District 151 where the Coolidge and Kennedy Schools are located. It is undisputed that in the short period of eight years, the City of Phoenix changed from a predominantly white to a predominantly Negro community.

In the case before us, the School Board followed the neighborhood school concept although the Negro population was concentrated in one portion of the School District as was the case in Gary. Here, all schools were integrated with at least one Negro teacher as was the case in Gary. Here, the safety factors were almost identical with those in Gary, such as many railroad tracks, main highways without sidewalks, drainage ditches, etc.

The majority opinion as well as the District Court seemed to place great confidence in Plan C. This was a proposal of Superintendent Watts. His impartiality and judgment might be questioned. The evidence showed he referred to residents of South Holland (in School District 151) as "the old Dutch" and "Chicago grasshoppers" because they were "one jump ahead of the plague as they hopped from area to area." The suggestion is made that these remarks were on a "confidential" tape. Whether or not that be so, they

---

1. 110 Congressional Record, page 12714.

were well publicized before the referendum was held seeking to increase the educational tax rate. This referendum was held shortly after the publication of this tape. The vote at the referendum was 1115 "No" and 477 "Yes."

In my view, the District Court's order requiring defendants to Adopt Plan C and bus approximately 790 Negro and white children to achieve a certain "racial make-up of each school" ignores not only our decision in Gary, but also ignores the Congressional intent in passing the Civil Rights Act of 1964, and the prohibition contained in Tit. 42, Section 2000c–6, U.S.C.

The order of the District Court also seems to have ignored the desperate financial condition of School District 151. Under Illinois law, general obligation bonds, when approved by voters, can be issued up to only 5% of the assessed valuation. School District 151 has been and is about at the limit of its bonding power.

I cannot agree with the novel constitutional theory urged by the Government to the effect that a constitutional violation depends not upon the effect of the actions of the School Board, but upon its psychological motivations. I understand the majority opinion does not agree with the District Court's finding that voters were racially motivated in the February and December 1964 elections. In any event, such a finding indicates that the trial court was greatly impressed by practically all of the Government's contentions in this case.

The District Court gave the School Board seven days to come forward with an adequate desegregation proposal of its own. The Government argues that this was "more than ample." Such an argument is ridiculous. Possibly the Board might have been able to assemble for a meeting within that period. In Taylor v. Board of Education of New Rochelle, 2 Cir., 294 F.2d 36 (1961) cited by the majority opinion and by the Government, Judge Kaufmann allowed the School Board three months to submit its plan. The same period was allowed in Dowell v. School Board of Okl. City, D. C., 244 F.Supp. 971, affd. 375 F.2d 158 (10 Cir., 1967).

This drastic limitation of time described is but another indication of the rapid pace upon which the trial was conducted. It is one of the reasons why I believe the defendants did not receive a fair trial. To me, the prejudice to the defendants is obvious.