UNITED STATES of America,
Plaintiff-Appellee,

v.

SCHOOL DISTRICT 151 OF COOK
COUNTY, ILLINOIS, et al.,
Defendants-Appellants.

No. 17754.

United States Court of Appeals,
Seventh Circuit.

Sept. 8, 1970.

Ronald M. Glink, Louis Ancel, Marvin J. Glink, Chicago, Ill., and John M. Van Der Aa, South Holland, Ill., for appellants.

William J. Bauer, U. S. Atty., Chicago, Ill., J. Harold Flannery, Department of Justice, Washington, D.C., Thomas A. Foran, U. S. Atty., Jack B. Schmetterer, First Asst. U. S. Atty., Jerris Leonard, Asst. Atty. Gen., Robert Pressman, Atty., Department of Justice, Washington, D.C., for appellee.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and KILEY, Circuit Judge.

KILEY, Circuit Judge.

This is the second appeal in this proceeding by the United States Attorney General[1] for desegregation of School District 151 in Cook County, Illinois. In the first appeal we affirmed, 404 F.2d 1125, the preliminary injunction order substantially implementing desegregation Plan C proposed by the District 151 Superintendent of Schools. 286 F.Supp. 786. Upon remandment for hearing upon the government's application for a permanent injunction, the district court conducted a hearing from January 13 to February 17, 1969, adopted the government's desegregation Plan I and ordered defendant Board to implement that Plan. 301 F.Supp. 201. The Board appealed.

1. 42 U.S.C. § 2000c–6(a) and (b).

We affirm, with one modification of the order.[2]

We refer to the three decisions, above cited, for the detailed geographical and political description of the $4\frac{1}{2}$ mile square school district and the demographic development of the racial patterns which prior to 1964 had made Coolidge School in the city of Phoenix entirely Negro, and Eisenhower, Madison and Roosevelt Schools outside of Phoenix non-Negro. United States v. School District 151 of Cook County, Illinois, 286 F.Supp. 786; 301 F.Supp. 201; and 404 F.2d 1125. The common holding of these three opinions was that the policies, practices and decisions of the School Board members have been based upon unconstitutional racial discrimination depriving Negro pupils of equal protection of the law in violation of the Fourteenth Amendment with respect to the drawing of attendance zones, pupil and teacher assignment, busing of pupils and selection of sites for additional schools.

At the conclusion of the hearings on remand, the district court, having found unlawful discrimination in the above-mentioned respects, permanently enjoined the Board from continuing its discriminatory practices, policies and decisions. It further ordered the Board to convert the Coolidge-Kennedy school complex into a combined upper grade center for all sixth, seventh and eighth grade pupils in the District and to bus White pupils in these grades to Coolidge-Kennedy; and to bus Kennedy-Coolidge kindergarten to fifth grade pupils (K–5) to various other schools in the District.[3]

A comparison of the arguments in the first appeal and in this appeal shows clearly that for the most part defendants have arrayed against the permanent injunction substantially the very arguments that were leveled against the preliminary injunction and which were rejected by this court. We are not disposed to rehash in this opinion the decisions made in our first opinion.[4] We

2. At oral argument this court, with agreement of the parties, held decision under advisement pending negotiations between the parties toward a constructive settlement of the issues. We expressed impatience at the intransigent positions of the adversaries and the continued arguments directed at justifying each party's position at the expense of the other's, with the important legal-racial and pupil-parent interests lost sight of. After several weeks during which the parties exchanged, criticized and finally rejected proposals, a Joint Report of failure of settlement was made to the court and is now of record before us.

3. The desegregation of teachers has been completed and the district court has retained jurisdiction to pass upon the location and construction of new schools in the District. We need not, therefore, deal further with these aspects of the district court's injunctive orders.

4. Briefly, and so far as still relevant to the present appeal, our opinion sustaining the preliminary injunction established that Bell v. School City of Gary, 324 F.2d 209 (7th Cir. 1963), cert. den. 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964), and its progeny, including Deal v. Cincinnati Board of Education, 369 F.2d 55

(6th Cir. 1966), cert. den. 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), are not controlling here, where the segregation has been found to be de jure, since Bell "presupposes an 'innocently arrived at' de facto segregation with 'no intention or purpose' to segregate Negro pupils from White." 404 F.2d at 1130. Further, as to the drawing of attendance zones, we found Taylor v. Board of Education, 294 F.2d 36 (2d Cir.), cert. den. 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), indistinguishable in principle since "in both cases, the Board was found to have drawn lines to effectuate and perpetuate a purposeful, discriminatory condition, and race was made the basis for school districting with the purpose and result of segregating public schools." 404 F.2d at 1132. Concerning the restructuring of the School District, we approved the finding of the district court that the Board rejected a proposed plan that would have eliminated the effects of past discrimination because of the Board's and the community's opposition to the desegregation that would have resulted from its implementation. We rejected, on the basis of Griffin v. County School Board, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the Board's contention that the government's reliance upon the psychological

further find unworthy of discussion in this opinion the Board's contentions that the district court had erroneous views of the applicable law which infected the proceedings with error, or that the court's questions put to witnesses showed bias, or that the court denied the Board a fair opportunity to present its case or denied it due process by introducing the original findings into the record instead of considering the application for permanent injunction *de novo*. Nor shall we discuss the fact findings which defendants challenge generally on the basis of testimony of Board witnesses which the district court was not compelled to accept as true, in view of the objective facts as to which there can be no controversy.

We turn then to the findings of fact of the district court which have been specifically challenged by the Board on this appeal. These are findings of fact Nos. 16–20 dealing with busing, Nos. 21–23 relating to the selection of new sites and the construction of new schools, Nos. 24–34 dealing with the drawing of attendance zones, and Nos. 35–38 with respect to the restructuring of the School District. These findings underlie ultimate finding of fact No. 39 and form the basis for conclusions Nos. 11 and 13. Each specific finding of fact states the relevant objective facts, and each group of findings ends with the inference that the purpose and effect of the pertinent policies and decisions of the Board either wholly or partially were based on the purposeful segregation of pupils in the District on the basis of race.

In view of the extensive record already made in this case,[5] we need only highlight the facts found to show that there is no merit to the claim that the findings are clearly erroneous. Concerning findings 16–20, the record shows White children living closer to Coolidge

and Kennedy than to Roosevelt School were bused to Roosevelt, where only White pupils attended, and the busing was not justified by considerations of safety; no White pupils were bused to Coolidge and Kennedy and no Negro pupils were bused to the four schools outside of Phoenix. There was testimony that the busing program could be explained only in the aspect of the total racial segregation "which it produced."

In support of findings 21–23 the record shows that a referendum was conducted in the District in April, 1964 for the purpose of obtaining the District's authority for the construction of a new school. Residents were told the school would relieve crowding at Coolidge and Roosevelt, with resulting integration. The vote was against the proposal. The proposal for a new school was again submitted to a referendum in December, 1964, but this proposal required that the Kennedy School be located adjacent to Coolidge, and that the Taft School be built in the "White" area below Phoenix. This proposal, which continued the residential-based school segregation, was approved. One Board member testified that he took into consideration in the proposal subject of the referendum "the effect of an integrated school I felt would have an effect on the passage of the bond issue."

The record relevant to findings 24–34 shows that formal attendance zones were first drawn in 1964 and were again formalized in 1966 after Kennedy and Taft were built. Before these formal zones were drawn, White children outside of Phoenix attended Coolidge and its predecessor school in Phoenix, but several Phoenix Negro families were not permitted to enroll their children at Roosevelt. From 1956 to 1967 increasing numbers of White children living closer to Coolidge than to Roosevelt were assigned to and walked to Roosevelt.

---

motivations of the Board to establish the unconstitutionality of its conduct was improper.

5. Twelve witnesses testified at the hearing on the preliminary injunction, and twenty-

four witnesses at the hearing on the permanent injunction. Three witnesses, McGovern, Wiersma and Graff, testified at both hearings.

The zones were drawn by a committee of Board members, two members of which asked to be appointed to make sure that only changes that "had to be made" would be made. And the three committee members told the president of the Board they wanted to keep Coolidge Negro. A recommendation of the committee indicated that one of the reasons for drawing the zones was that neighborhood schools were desirable and that neighborhood schools should serve a "like socio-economic level." [6]

Finally, as to findings 35-38 the record shows that Plan C's upper grade recommendation, i. e., the education of seventh and eighth grade students at one location, was approved in principle by educators and Board members. There was testimony that Coolidge was the only school in the District large enough to accommodate all upper grade students, that it was better to have a center for these students instead of scattering them throughout the other schools, and that it was the most educationally sound proposal. And there was testimony—considered in the light of the foregoing testimony—which justified the inference that Plan C's recommendation of Coolidge as the upper grade center was rejected because of hostility of the residents of the District to desegregation.

■ We think there was ample support in these findings for the ultimate finding of fact that the pupils in School District 151 have been segregated on the basis of race, the result of which has been a dual system of schools identifiable because of racial composition. We reaffirm our conclusion on the first appeal of this case that the district court was not clearly in error in finding the Board has practiced unconstitutional invidious discrimination with respect to student busing, selection of school sites, drawing of attendance zones and adoption of an educational structure for the District.

Here, as on the first appeal, much of defendants' arguments against the findings, relying again on *Bell* and *Deal*, presuppose that the defense testimony required the district court to find that because the racial pattern of the area was an innocent development, the racial discrimination and segregation in the school system likewise was the result of innocent good faith performance of defendants in fulfilling their duties.

There is no merit to the Board's argument based upon financial difficulty of the District in implementing Plan I as ordered by the court. It is a matter of common knowledge that other school districts in Cook County, the Chicago Public School System, and the Illinois Legislature are suffering under the necessity of meeting expanding educational costs. We pointed out in our opinion in the first appeal that the claimed financial difficulty is no bar to enforcement of valid desegregation orders. The increased busing cost problems urged upon us are unpersuasive in the District which is but 4½ miles square and additional cost expected under the order is $15,000.[7]

---

6. The plan of student assignment directed in the order before us was based upon a study of the District conducted by the Department of Health, Education and Welfare at the suggestion of the government and upon request of the defendants, in accordance with Section 403 of the 1964 Civil Rights Act, 42 U.S.C. § 2000c-2. This is approved procedure. *See* Alexander v. Holmes County Board of Education, 396 U.S. 1218, 90 S.Ct. 14, 24 L.Ed.2d 41 (1969).

7. Any reliance by the Board upon the recent Swann et al. v. Board of Edu-

cation, 397 U.S. 978, 90 S.Ct. 1099, 25 L.Ed.2d 389 (1970), is misplaced. Defendants argue that approximately 55% of the pupils in School District 151 are to be bused while in North Carolina's Charlotte-Mecklenburg school district, subject of the *Swann* case, less than 50% were to be bused and that nevertheless the court of appeals there vacated the district court's order. The court there decided the "board * * * should not be required to undertake such extensive additional busing to discharge its obligation to create a unitary school system."

In remanding the cause in its first appeal, this court stated that the burden would be upon the Board to present a plan which promised "meaningful and immediate progress toward disestablishing the existing unconstitutional discrimination." This was effectually a direction to disestablish the segregated school system and reform it into a unitary system. *See Alexander, supra.*

We see no sound basis for defendants' claim that the district court committed error in imposing upon them the burden of proving justification of their policies and decisions. We decided in the first appeal that the district court had an ample basis for fact findings which would justify a reasonable forecast that the government would ultimately prevail in this suit. We need not go beyond the objective, uncontrovertible facts to find again an ample basis for the similar findings before us. The record required defendants to go forward—after the government rested its case in chief—to show that the objective facts were not the result of the unconstitutional discriminatory policies and decisions of the Board. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567.

After this court's mandate issued in the first appeal, defendants offered substantially no plan of desegregation, and up to almost the end of the hearing after remand had not even inquired of the Superintendent of Schools with respect to a plan or to alternatives to those offered by the government. This situation in itself justified the district court's adoption of a government plan. *See Alexander, supra.* At the hearing the government presented two plans for desegregating the district.

Defendants were "unwilling" to adopt either plan. The government plans were supported by testimony of those who had drawn the plans and proposed them. The court found that government Plan I was educationally sound, but would involve additional busing in 1969–70: the K–5 students from Kennedy and Coolidge would be bused to schools outside of Phoenix, and sixth, seventh and eighth grade students from outside Phoenix would be transported to Coolidge.

We approve the district court's order, with one exception. The court ordered that all students in grades 6–8 be assigned to the Coolidge-Kennedy complex as upper grade center, with Eisenhower, Madison, Roosevelt and Taft serving grades K–5, and K–5 pupils residing in Phoenix assigned to Eisenhower, Madison, Roosevelt and Taft. We modify the order with respect to K–2 children. We are not disposed to compel transfer of Phoenix K–2 pupils unless parents of the children desire. There is nothing in the record which requires our approval of that part of the decree. In our opinion, the parents of these small children are best suited to determine whether it is more beneficial to the children to be close to home or bused to other schools. We think the busing of those children should be done only if their parents consent.[8]

We approve the district court's reservation of jurisdiction over the cause in order that it may require, and take, such action as from time to time may be needed to the end that the court's decree directed at undoing the effects of the unconstitutional segregation in School District 151 on the basis of race be fully complied with and without delay. See

The school system there served a population of over 600,000 covering an area of 550 square miles with 84,500 pupils attending 106 schools. The district court's elementary school plan disallowed by the court of appeals would have required transporting 9,300 pupils in 90 additional buses with an average daily round trip of 15 miles through "central city and suburban traffic." The district court there estimated the additional cost for the first year at $1,011,200. The court applied the test of reasonableness in its disapproval. applying the same test here the district court could well find Plan I requirements reasonable, with the exception as to K–2 children, noted later in this opinion.

8. This with some "amelioration" was a suggestion of the government according to the Joint Report filed with the court.

Green v. County School Board, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and *Alexander, supra.*

Affirmed as modified.

DUFFY, Senior Circuit Judge (dissenting).

The opinion herein makes reference to the first appeal in this case wherein this Court affirmed the preliminary injunction issued by the District Court. However, no mention is made that our decision in the first appeal was by a divided court.

In my previous dissenting opinion, I invited attention to the fact that prior to the filing of the instant suit, complaint had been made to the Superintendent of Public Instruction for the State of Illinois which contained charges of segregation of Negro teachers and pupils in School District 151. Those charges were similar to the charges filed in the case at bar.

After hearing evidence, the Superintendent of Public Instruction rendered a decision in which he found " * * * a consideration of all evidence does not show that any child or teacher is segregated in or excluded from a particular school solely by reason of their race as charged in the petition."

I also pointed out that a similar complaint was made to the United States Department of Health, Education and Welfare (HEW), but that after an investigation by officials of that Agency, HEW informed the School Board it could see no pattern of wilful discrimination.

In a memorandum by the investigating officials which was addressed to the Assistant Commissioner in the Office of Education of the Department of Health, Education and Welfare, it was stated "There is no evidence of gerrymandering of the Coolidge-Kennedy boundaries as these zones are the same as they were when the school was predominantly White * * *. This situation seems to be a classical *de facto* segregation situation in which there are no elements of racial discrimination which come within the purview of Title VI. * * * * "

On the previous appeal, the School District, in my opinion, properly complained that on July 8, 1968, the District Court adopted, without any change, the twenty-six pages of Findings and Conclusions, and a six-page Order submitted by the Government.

On the second hearing on the question of a permanent injunction, the trial court continued to display the same attitude, and on May 15, 1969, the District Court again without changing a word, accepted the Government's seventy-three proposed Findings of Fact; the Government's thirty-three proposed Conclusions of Law, and the Government's proposed Order, in all some ninety-seven pages. There is no justification for such a procedure which has been strongly criticized by many courts. See United States v. El Paso Natural Gas Company, 376 U.S. 651, 656–657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964). This practice would seem to indicate that in this case, the Government could do no wrong.

The School District also objects to the many instances of cross examination of its witnesses by the District Judge which, it claims, was often done in a caustic and unfair manner.

In 1948, the City of Phoenix was a predominantly White community and the student enrollment at the Coolidge School was approximately 70% White. However, within the next eight years, due to an influx of Negroes who came to reside in Phoenix, the housing pattern was altered so that Phoenix became an almost exclusively Negro community. Reflecting this change, the enrollment of the Coolidge School at the start of the 1956–57 school year was approximately 99% Negro.

There is no evidence in the record that during the eight-year period starting in 1948, the School Board did anything to change the racial composition in the Coolidge School. Certainly, it cannot be denied that the attendance bound-

aries for Coolidge in 1956 were identical with those which existed in 1948.

One thing is obvious and beyond dispute, and that is that the failure to change school boundaries in 1964 could not, and did not play any part in Coolidge becoming a 99% Negro school during the period from 1948 to 1956.

Bell v. School City of Gary, 324 F.2d 209 (7 Cir., 1963) established the law in this Circuit pertaining to so-called de facto segregation. It is quite apparent that my two colleagues in this case are not happy with our holding in *Gary*. They seek to avoid applying the principles announced in that case by saying that Bell v. Gary " * * * and its progeny, including Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir., 1966), cert. den. 389 U.S. 847, 88 S. Ct. 39, 19 L.Ed.2d 114 (1967), are not controlling here, where the segregation has been found to be de jure, * * *."

I emphatically disagree. We clearly held in *Gary* that no affirmative constitutional duty existed to change innocently arrived at school attendance districts by the mere fact that shifts in population had increased or decreased the percentage of Negro and White populations. That is the situation in the case now before us.

I feel it imperative to again point out that a petition for certiorari in the *Gary* case was denied. (377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964)). Further, our opinion in *Gary* was followed by the Tenth Circuit in Downs v. Board of Education of Kansas City, 336 F.2d 988 (10 Cir., 1965). A petition for certiorari in that case was denied. (380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965)). Our decision in *Gary* was also followed by the Sixth Circuit in Deal v. Cincinnati Board of Education, 369 F.2d 55 (6 Cir., 1966). Again, certiorari was denied. (389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967)).

I also deem it appropriate and indeed necessary to again note that when the Bill which later became the Civil Rights Act of 1964 was before the House of Representatives, it gave the Attorney General wide authority to file suits in any part of the country in order to force integration. However, the United States Senate adopted an amendment which was included in the Bill which became law and which provided "Nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance. * * *."

In the Senate debate, Senator Humphrey who was in charge of the Bill, stated (110 Congressional Record, p. 12714) that the provision " * * * merely quotes the substance of a recent court decision which I have with me and which I desire to include in the Record today, the so-called Gary case." [Referring to Bell v. Gary, *supra*].

Thus, the principles which we announced in our *Gary* decision have been before the Supreme Court on three separate occasions. In each case a review of those principles we announced in *Gary* was denied. Furthermore, the Congress must have had our decision in mind when it passed the Civil Rights Act of 1964.

In my previous opinion on the first appeal, I pointed out the many important factors in *Gary* which are also present in the instant case. Among other conditions cited were—In 1961–1962 certain areas in Gary contained twelve schools where 99% to 100% of the students were Negroes. I stated "Here, all schools were integrated with at least one Negro teacher as was the case in Gary. Here, the safety factors were almost identical with those in Gary, such as many railroad tracks, main highways without sidewalks, drainage ditches, etc." Also applicable on this appeal from the permanent injunction is my previous statement "In my view, the District Court's order requiring defendants to adopt Plan C and bus approximately 790 Negro and White children to achieve a

certain 'racial make-up of each school' ignores not only our decision in Gary, but also ignores the Congressional intent in passing the Civil Rights Act of 1964, and the prohibition contained in Tit. 42, Section 2000 C–6, U.S.C." Furthermore, I do not believe the record before us justifies a finding of purposeful discrimination.

It was, of course, the duty of the trial judge to maintain throughout the trial an atmosphere of impartiality. Defendants strongly urge that there was a flagrant abuse of this obligation by the trial court, and that there was clearly a pre-judgment of the merits of the case.

The Government offers several excuses for the trial court's "occasional sarcasm", "caustic lash" and "judicial exasperation with defendants."

The Government urges that it was a long, tiring nonjury trial. However, the trial court's attitude was evident from the beginning of the trial. In fact, the opening statements by defendants' attorneys were repeatedly interrupted by the trial judge.

The District Court did not hesitate to order the busing of Phoenix (Kennedy School) K–2 children who are very young. However, my brothers on this panel announce in the majority opinion that they are not disposed to compel transfer of Phoenix (Kennedy School) K–2 pupils unless their parents so desire. They say—"In our opinion, the parents of these small children are best suited to determine whether it is more beneficial to the children to be close to home or bused to other schools." I agree with this statement. My only complaint is that it does not go far enough.

The majority opinion makes light of the increased cost of busing which is necessary under the plan approved by the District Court. The opinion states: "The increased busing cost problems urged upon us are unpersuasive in the District which is but 4½ miles square

and additional cost expected under the order is $15,000."

During the first full year under the upper grade center ordered by the District Court, the school district was required to borrow $510,000 as compared to the total amount of $260,000 borrowed the previous year.

Furthermore, the busing costs last year were not met by the transportation tax levies, despite the fact that the School Board doubled the tax levy to 8 cents, the maximum permissible without a voter referendum. There was a deficit in the transportation fund at the end of last year of $16,500 which required the issuance of tax anticipation warrants against the transportation levy.

The plan adopted and the order of the District Court seem to ignore the desperate financial condition of School District 151. Illinois law provides that general obligation bonds, when approved by the voters, can be issued up to only 5% of the assessed valuation. Ever since this litigation was commenced, School District 151 has been and is about at the limit of its bonding power.

When Plan C was approved by the District Court's decision on the petition for a preliminary injunction, it meant that approximately 790 Negro and White children would have to be bused to achieve certain "racial makeup of each school."

Under the District Court's order on the Petition for a Permanent Injunction, the Government argued the busing of 55% of the total student body of the District is incidental to the establishment of unitary schools in the system. I disagree. The plan was actually drawn to overcome the effects of residential or *de facto* segregation and to integrate the student bodies of each of the six schools in School District 151. There was an arbitrary assignment of black students who resided in the City of Phoenix to each of the other schools in the District.

An illustration of the extremes included in the District Court's order as to busing is the requirement therein that " * * * Buses shall be routed so as to eliminate or consolidate those different lines which serve primarily white or primarily negro students. * * * "

It is apparent that the trial judge did not attempt to distinguish between "White" and "Negro" schools established under the compulsion of state laws and those established by the operation of residential housing patterns. It would seem to have been the view of the trial judge that predominantly White and predominantly Negro schools are impermissible under the Constitution whatever the cause. I consider very appropriate a statement made by Chief Justice Burger in a concurring opinion in Northcross et al. v. Board of Education of Memphis, Tennessee, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970) (38 L. W. 4220), wherein he stated " * * * however, we ought to resolve some of the basic practical problems when they are appropriately presented including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court."

It is quite true as the School District argues, that the inevitable effect of non-integrated residential patterns, whatever the reasons for their existence, have been to produce corresponding school attendance patterns without any need for official action. I think it follows that the existence of a predominantly Negro school in a bi-racial school district is of no probative value in showing any official acts of discrimination. In my opinion, there was no justification for the defendants being required to shoulder the Government's burden of proof.

I would reverse.